**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **D&S MARINE TRANSPORTATION, L.L.C.** | * | **CIVIL ACTION** |
| | * | |
| | * | **NO. 2:14-CV-2048** |
| | * | |
| **V.** | * | **SECTION "S" (4)** |
| | * | |
| **S & K MARINE, L.L.C., BEN STRAFUSS, AND BJS BLESSEY, L.L.C.** | * | **JUDGE LEMMON** |
| | * | |
| | * | **MAG. JUDGE ROBY** |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**

NOW INTO COURT, through undersigned counsel, comes plaintiff, D & S Marine Transportation, L.L.C. ("Plaintiff" or "D&S"), to submit this Memorandum in Opposition to the Renewed Motion for Summary Judgment filed by S&K Marine, LLC and Ben Strafuss (collectively, the "Defendants") (Rec. Doc. 94).

In their renewed motion, the Defendants claim that "[t]he parties to this case never had an agreement, and there is no room for compromise or reasoned disagreement on this dispositive issue; Plaintiff does not have and never had any viable case."[1] This position ignores the testimony of Calvin Klotz, who testified that prior to moving forward the parties agreed upon a basic parameters of terms, which included the price and term for two vessels.[2] Further, the Defendants disregard this Court's previous ruling that there remain "disputed issues of fact regarding what steps D&S Marine took in performance of the contract" and whether the Defendants "knew about those actions so as to effectuate S&K Marine's tacit acceptance of the contract."[3] Accordingly, the Defendants' Renewed Motion for Summary Judgment should be denied.

[1] Memorandum in Support of Renewed Motion for Summary Judgment (Rec. Doc. 94-2 at Pg. 5).
[2] Exhibit "W" – Deposition of Calvin Klotz at Pg. 48, 51.
[3] Order and Reasons (Rec. Doc. 74) – denying the first motion for summary judgment filed by the defendants.

## Table of Contents


I. Preliminary Statement ........ 1
II. Procedural History ........ 2
III. Factual Background ........ 3
IV. Summary Judgment Standard ........ 15
V. Fixture Agreements and Oral Agreements For Maritime Bareboat Agreements ........ 16
VI. Oral Agreements and Tacit Acceptance Pursuant to Louisiana Law ........ 19
VII. Conclusion ........ 22


## Table of Authorities


**Cases**

Agrico Chemical Co. v. M/V BEN W. MARTIN, 664 F.2d 85, 91 (5th Cir.1981) ........ 17

Amoco Prod. Co. v. Horwell Energy, Inc., 969 F.2d 146, 147-48 (5th Cir. 1992). ........ 16

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). ........ 16

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........ 16

E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia, 673 F.Supp. 796 (E.D. La.1987) aff'd, 876 F.2d 1168 (5th Cir.1989) ........ 17, 19

Great Circle Lines, LTD. v. Matheson & Co., LTD., 681 F.2d 121, 124 (2d. Cir.1982) ........ 18

Greenslate v. Tenneco Oil Company, 623 F.Supp. 573, 575 (E.D.La.1985) ........ 17

Hollinger v. Warrior Tombigbee Trans. Co., 572 F.Supp. 1291, 1295 (N.D.Miss.1983) ........ 17

Hornbeck Offshore Servs., LLC v. Fairfield Indus., Inc., CIV.A.09-2905, 2010 WL 2008971, at *2 (E.D. La. May 17, 2010) ........ 17, 18

Jambon & Associates, L.L.C. v. Seamar Divers, Inc., 2009 WL 2175980 at *6 (E.D.La.2009). 17

Little v. Liquid Air Corp., 37 F.2d 1069, 1075 (5th Cir. 1994). ........ 16

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 571, 587 (1986) ........ 16

Meyers v. Burger King Corp., 618 So.2d 1123 (La. Ct. App. 1993) ........ 20

Ne. Marine, Inc. v. M/V MASTER MORGAN, CIV. A. 95-1189, 1995 WL 591330, at *2 (E.D. La. Oct. 4, 1995) ........ 17

P.E.P. Shipping (Scandinavia) APS v. Noramco Shipping Corp., 1997 WL 358118 at *2 (E.D.La.1997) ........ 18

Sea-Land Serv., Inc. v. Sellan, 64 F.Supp.2d 1255 (S.D. Fla.1999) aff'd, 231 F.3d 848 (11th Cir.2000) ........ 17

Suire v. Lafayette City-Par. Consol. Gov't, 2004-1459 (La. 4/12/05); 907 So.2d 37........ 19

Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047 (5th Cir. 1996)........ 16

**Other Authorities**

Schoenbaum, Admiralty and Maritime Law § 11–2 (4th ed.2004) ........ 17, 18

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56........ 16

**Louisiana Civil Code Articles**

La. C.C. art. 1947........ 1

## I. PRELIMINARY STATEMENT

The Defendants' Renewed Motion for Summary Judgment (Rec. Doc. 942) raises issues which were previously reviewed by this Court in ruling upon the Defendants' Motion for Summary Judgment (Rec. Doc. 36), which was denied on June 11, 2015 (Rec. Doc. 74) and the Defendants' Motion to Dismiss (Rec. Doc. 18), which was denied, in part, on January 30, 2015 (Rec. Doc. 35).

In the Order and Reasons denying the Defendants' Motion to Dismiss, this Court examined La. C.C. art. 1947 and explained that when "parties [to a contract] have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form."[4] This presumption "can be rebutted by demonstrating that the parties tacitly accepted the terms agreed upon by beginning performance."[5] Later, in denying the Defendants' first Motion for Summary Judgment, the Court noted that an email from Calvin Klotz to Defendant, Ben Strafuss, demonstrated that there are "disputed issues of fact regarding what steps D&S Marine took in performance of the contract it believed it had with S&K Marine, and whether S&K Marine knew about those actions so as to effectuate S&K Marine's tacit acceptance of the contract regardless of whether it was in the contemplated written form."[6]

Here, the Defendants' Renewed Motion for Summary Judgment once again claims that the Plaintiff's claims should be dismissed because the agreement between the parties was never reduced to writing, as initially contemplated by the parties.[7] The Defendants further contend that the written agreement was modified, so that there was no agreement between the parties, despite the fact that Klotz deposition testimony indicates the parties agreed upon the day rate and the term

[4] Order and Reason (Rec. Doc. 35 at Pg. 7) regarding Defendants' Motion to Dismiss.
[5] Order and Reason (Rec. Doc. 35 at Pg. 8) regarding Defendants' Motion to Dismiss *citing* Myers v. Burger King Corp., 618 So.2d 1123 (La. Ct. App. 1993).
[6] Order and Reasons (Rec. Doc. 74).
[7] *See* Memorandum in Support of Renewed Motion for Summary Judgment (Rec. Doc. 94-2 at Pg. 6 of 30); Memorandum in Support of Motion for Summary Judgment (Rec. Doc. 36-1 at Pg. 6 of 17)

for a contract to operate the disputed vessels. Both of the Court's previous Orders and Reasons still ring true today, and the Defendants' Renewed Motion for Summary Judgment actually raises additional genuine issues of material fact which preclude granting their motion. As previously discussed, D&S commenced work in furtherance of their agreement by spending money to equip and prepare the vessel for navigation, monitoring and providing input on certain modifications made to the disputed vessels, and entering into time charter agreements with two of its customers to ensure the vessels were prepared to begin work immediately upon completion. D&S also relied upon the representations, by word and conduct, of the Defendants and their agents, and in doing so missed out on opportunities to obtain other vessels in their efforts to expand their fleet and meet the growing needs of its customers.

The evidence submitted in support of this opposition demonstrates the Defendants knew, encouraged, benefitted from D&S' work, and failed to object to said work. This constitutes tacit acceptance of the terms of their Agreement with D&S. To the extent the Defendants or their representatives claim that they did not know about the work or dispute the extent of the work performed by D&S, the evidence submitted herein indicates otherwise and, at minimum, presents genuine issues of fact which preclude granting summary judgment.

## II. PROCEDURAL HISTORY

D & S Marine Transportation, LLC filed suit on August 11, 2014, in the 32nd Judicial District Court for the Parish of Terrebonne, State of Louisiana, against S & K Marine, BJS Blessey Marine, L.L.C, and Ben Strafuss. On September 8, 2014, the Defendants removed this matter to the United States District Court – Eastern District of Louisiana.[8]

[8] Rec. Doc. 1.

On November 20, 2014, the Defendants' their Motion to Dismiss.[9] On January 30, 2015, the Court denied the Plaintiffs' Motion to Dismiss, in part, and the Plaintiff now has claims for breach of contract, bad faith breach of contract, and detrimental reliance against S&K, and tortious interference with contractual relations against Strafuss.[10]

On February 25, 2015, Defendants filed their first Motion for Summary Judgment. On June 11, 2015, the Court denied the Defendants' Motion for Summary Judgment declaring that the affidavits submitted on behalf of the Plaintiff and the February 17, 2014 email from Calvin Klotz to Ben Strafuss demonstrated that there are disputed issues of fact regarding what steps D&S Marine took in performance of the contract it believed it had with S & K Marine and whether S & K Marine knew about those actions so as to effectuate S & K Marine's tacit acceptance of the contract regardless of whether it was in the contemplated written form.[11]

On April 5, 2016, the Defendants filed the Renewed Motion for Summary Judgment, which is currently before the Court, alleging that there are no genuine issues of material fact that there was never a contract between the parties because there was "never any agreement at all" between the parties.[12] In response, D&S, through its undersigned counsel, files this memorandum in opposition.

## III. FACTUAL BACKGROUND

This lawsuit arises out of the Defendants' breach of long term charter agreements for two inland towing vessels commonly referred to as NGS-106 and NGS-107. Plaintiff, D&S, entered into a bareboat agreement (the "Agreement") with S & K Marine, L.L.C. ("S&K") and its member/manager Ben Strafuss ("Strafuss") for a five-year bareboat charter, with an option for a

[9] Rec. Doc. 18.
[10] Rec. Doc. 35.
[11] Order and Reasons (Rec. Doc. 74).
[12] Memorandum in Support of Renewed Motion for Summary Judgment (Rec. Doc. 94-2 at Pg. 10).

second five-year term and an option to purchase the two vessels at the conclusion of the term. For the purposes of this memorandum, Strafuss, Calvin Klotz, and S&K will be collectively referred to as the "Owners."[13] Pat McDaniel ("McDaniel"), a former partner and owner of D&S Marine Transportation, LLC, handled the Agreement on behalf of the D&S, and Calvin Klotz ("Klotz") acted on behalf of the Owners.[14] The initial discussions between the parties began in the Summer of 2013 whenever Klotz approached McDaniel about bareboat chartering vessels on behalf of the Owners.[15]

At that time, both Strafuss and Klotz were subject to employment agreements with Cummins Midsouth, which required Cummins to grant permission before either could engage in any other enterprise outside of their work for Cummins.[16] According to Strafuss, Klotz was also bound by the same Cummins' employment agreement.[17] Up and through February 14, 2014, when Strafuss officially left Cummins, Strafuss was subject to this employment agreement and never requested nor received permission to operate the NGS-106 or NGS-107.[18] Strafuss claimed that he did not need permission to build the NGS-106 or NGS-107 because while the vessels were being built they were not technically in competition with anyone.[19] Due to these restrictions, McDaniel was aware that Strafuss and Klotz were concerned with keeping this new venture secret from others in the marine industry.[20] The confidential nature and Strafuss and Klotz involvement with NGS-106 and 107 and the fact that both Strafuss and Klotz remained actively employed by Cummins

[13] Exhibit "U" – Deposition of Pat McDaniel at Pg. 47, Lines 2-13 and Lines 22-25; Exhibit "T" – Deposition of Ben Strafuss at Pg. 41.
[14] Exhibit "U" – Deposition of Pat McDaniel at Pg. 22, 50, 128,130, 354, and 376; Exhibit "W" – Deposition of Calvin Klotz at Pg. 25-26.
[15] Exhibit "U" – Deposition of Pat McDaniel at Pg. 345-346.
[16] Exhibit "T" – Deposition of Ben Strafuss at Pg. 48.
[17] Exhibit "T" – Deposition of Ben Strafuss at Pg. 51.
[18] Exhibit "T" – Deposition of Ben Strafuss at Pg. 48.
[19] Exhibit "T" – Deposition of Ben Strafuss at Pg. 55.
[20] Exhibit "U" – Deposition of Pat McDaniel at Pg. 127-128.

throughout the construction of the vessels is indicative that the Owners befitted from and encouraged D&S taking an active role with overseeing the construction of the vessels and ensuring that upon completion of construction the vessels would immediately generate income for the Owners.

According to the New Generation Shipyard ("NGS") visitor log in sheets, D&S first visited the shipyard on May 30, June 26, and July of 2013.[21] The sole purpose of all D&S visits to the shipyard were related to its future operation of NGS-106 and NGS-107.[22] It should be noted, however, that the NGS visitor log in sheets cannot capture the exact number of times that D&S personally visited the yard.[23] In any event, D&S personnel appear in the visitor log on sixteen (16) occasions from May 2013 through the end of January of 2014, while the Owners made a total of three (3) visits during the same period.[24] Klotz testified that he knew McDaniel was making visits to the shipyard, and emails reflect that Klotz also had knowledge that other D&S employees were performing work in furtherance of their Agreement.[25]

On August 1, 2013, Strafuss and Klotz entered into a written contract which provided that they would form a "yet-to-be-named LLC" to own a push boat to be built by New Generation.[26] Regardless of what Strafuss and Klotz decided to name their entity, D&S knew that the vessel owner was a partnership between Klotz and Strafuss.[27] As part of this contract, Klotz was charged to "find and negotiate a favorable dry lease" with a "reputable push boat operator."[28] Strafuss

---

[21] Exhibit "A" – NGS visitor log sheets.
[22] Exhibit "U" – Deposition of Pat McDaniel at Pg. 346-348.
[23] Exhibit "U" – Deposition of Pat McDaniel at Pg. 54-55; Exhibit "V" – Deposition of Joe Gregory at Pg. 34, Ln. 18-21.
[24] Exhibit "A" – NGS visitor log sheets
[25] Exhibit "W" – Deposition of Calvin Klotz at Pg. 160; Exhibit "E" – Email string regarding painting NGS-106 (D&S 175).
[26] Exhibit "B" – Contract between Strafuss and Klotz.
[27] Exhibit "U" – Deposition of Pat McDaniel at Pg. 110, Ln. 18-21.
[28] Exhibit "B" – Contract between Strafuss and Klotz; Exhibit "T" – Deposition of Ben Strafuss at Pg. 53.

personally did not contact any potential operators.[29] Klotz was given this role because he had more experience in the maritime industry than his partner, and in furtherance of this contract.[30] Klotz took the lead on behalf of the Owners in their communications with D&S, and Strafuss relied upon Klotz in this area.[31] Klotz testified that Pat McDaniel took the lead on behalf of D&S.[32] In turn, Klotz would relay information onto his partner Strafuss.[33] Klotz assumed that McDaniel was relaying the information onto his partners at D&S.[34] According to Strafuss, the "yet-to-be-named LLC" which was eventually formed was S & K Marine, LLC.[35]

Also on August 1, 2013, Strafuss and Klotz entered into a Vessel Construction Contract with New Generation Shipyard for NGS-106.[36] According to email sent from Klotz to Strafuss, the Owners began moving forward with D&S at this time.[37] As part of the understanding between the parties, D&S would act as the bareboat charterer of the vessels, and D&S would then in turn time-charter the vessels to its existing customers.[38] Klotz testified that he was aware the "ultimate goal" was for D&S to time charter the vessels, and he acknowledged that he knew all of the other D&S vessels were on time-charter.[39] In addition, the written Bareboat Charter Agreement reflects that D&S could time charter the vessels without the prior written consent of the Owners.[40] From the outset, the immediate operation of the vessels upon their completion was important to the Owners, who set the goal of operating the vessels by the end of 2013 to take advantage of certain

---

[29] Exhibit "T" – Deposition of Ben Strafuss at Pg. 84.
[30] Exhibit "W" – Deposition of Calvin Klotz at Pg. 25-26; Exhibit "T" – Deposition of Ben Strafuss at Pg. 67.
[31] Exhibit "W" – Deposition of Calvin Klotz at Pg. 25-26; Exhibit "T" – Deposition of Ben Strafuss at Pg. 67.
[32] Exhibit "W" – Deposition of Calvin Klotz at Pg. 26.
[33] Exhibit "W" – Deposition of Calvin Klotz at 26.
[34] Exhibit "W" – Deposition of Calvin Klotz at 26.
[35] Exhibit "T" – Deposition of Ben Strafuss at Pg. 41.
[36] Exhibit "C" – Vessel Construction Contract for NGS-106.
[37] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055) at ¶ 2.
[38] Exhibit "S" – Bareboat Charter Agreement at ¶ 17.
[39] Exhibit "W" – Deposition of Calvin Klotz at Pg. 151, Ln. 6-16.
[40] Exhibit "S" – Bareboat Charter Agreement at ¶ 17.

tax advantages through accelerated depreciation of the vessels.[41] In furtherance of this understanding, D&S immediately got involved in trying to speed up the construction process for NGS-106.[42]

On October 16, 2013, the Owners signed a vessel construction contract for NGS-107.[43] This date is critical because according to Klotz the Owners "would not have signed [the] second vessel on October 16, 2013 if [the Owners] did not have [D&S Marine's] verbal commitment to do a deal."[44] Not surprisingly, based upon its Agreement with the Owners, D&S entered into binding, verbal contracts with two of its customers, Canal Barge Company and Kirby Inland Marine, to time charter the NGS-106 and NGS-107, respectively.[45] The D&S time charter agreement with Canal Barge Company was eventually memorialized into a written time-charter agreement and was shared with the Owners prior to being officially informed that D&S would no longer receive the vessels.[46] By October 16, 2013, the Parties had committed to one another for both NGS-106 and NGS-107, and the Owners knew, encouraged and required D&S to perform work in furtherance of their Agreement. McDaniel certainly believed that D&S and the Owners reached an Agreement on both the NGS-106 and NGS-107, and D&S was committed to take and charter NGS by the end of December, as the Owners had requested.[47]

According to Klotz, despite there being no fully executed written agreement, the Owners were moving forward with the idea that D&S would be their bareboat charterer.[48] During his deposition, Klotz was questioned about whether D&S and the Owners agreed upon certain

---

[41] Exhibit "W" – Deposition of Calvin Klotz at Pg. 17; Exhibit "U" – Deposition of Pat McDaniel at Pg. 103.
[42] Exhibit "U" – Deposition of Pat McDaniel at Pg. 103.
[43] Exhibit "D" – Vessel Construction Contract for NGS-107.
[44] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055) at ¶ 2.
[45] Exhibit "U" – Deposition of Pat McDaniel at Pg. 37-42; Pg. 77, Ln. 2-5; Pg. 360.
[46] Exhibit "O" - Emails between Pat McDaniel and Calvin Klotz (Klotz 16) with attached Time Charter Agreement between D & S Marine, LLC and Canal Barge Company.
[47] Exhibit "U" – Deposition of Pat McDaniel at Pg. 71, Ln. 13-20; Pg. 112-113.
[48] Exhibit "W" – Deposition of Calvin Klotz at Pg. 39.

"essential terms" prior to October 16, 2013. Klotz stated that D&S and the Owners couldn't "move forward" unless there was an agreement on a basic parameter of terms.[49] Prior to moving forward, the Parties agreed upon "some initial bullet points" and a parameter of terms.[50] For example, Klotz stated that the Parties agreed upon an initial day rate of $850/day for the first five year term, and later on, the Parties agreed upon a "second half" day rate of $900/ day for the second five year term.[51] McDaniel agrees that D&S had a verbal agreement with the Owners for the two vessels whereby the parties agreed to a time frame and rates, and in turn D&S entered into time charter agreements with its customers for both vessels.[52] Once these terms were agreed upon, the parties moved forward with the understanding that they would continue to refine the minor details as they would arise.[53] For instance, with regard to fueling the vessels prior to service, Klotz indicated that he had "talked to Pat [McDaniel] about [fueling the vessel] and he said we would work out any details like this on final agreement."[54]

By October of 2013, New Generation Shipyard, with the approval of the Owners, began moving forward with adapting NGS-106 to fit the specifications for D&S' fleet and meet D&S' needs.[55] The purpose was to ensure consistency between the new vessels and rest of D&S' fleet.[56] For example, Klotz emailed Strafuss and McDaniel with images of the NGS-106, which was being primed to be painted in the D&S color scheme.[57] Klotz requested that McDaniel to help ensure the shipyard had the correct color scheme for D&S.[58] In turn, McDaniel informed Klotz that he would

---

[49] Exhibit "W" – Deposition of Calvin Klotz at Pg. 48.
[50] Exhibit "W" – Deposition of Calvin Klotz at Pg. 48.
[51] Exhibit "W" – Deposition of Calvin Klotz at Pg. 51.
[52] Exhibit "U" – Deposition of Pat McDaniel at Pg. 186, Ln. 7-10.
[53] D&S Petition at Paragraph 12; Exhibit "F" – Email string regarding fueling vessel for Kirby (Defendant 33-34); Exhibit "U" – Deposition of Pat McDaniel at Pg. 117, Ln. 19-22.
[54] Exhibit "F" – Email string regarding fueling vessel for Kirby (Defendant 33-34).
[55] Exhibit "W" – Deposition of Calvin Klotz at Pg. 36.
[56] Exhibit "W" – Deposition of Calvin Klotz at Pg. 37.
[57] Exhibit "E" – Email string regarding painting NGS-106 (Defendant 26-27 and D&S 175-177).
[58] Id.

have Thomas Prosperie, the D&S port engineer, communicate with the shipyard for this reason.[59] McDaniel also forwarded this email to his contact at Canal Barge, Skip Plaisance, to keep Canal Barge informed on the progress of the vessel which D&S had agreed to time charter to them.[60]

The biggest modification was changing out the marine gears, which serve as the transmission of the vessel, to be in line with the rest of the D&S fleet.[61] According to Klotz, the modification of the marine gears likely occurred in August of 2013 and was done at the request of D&S.[62] In addition, the pitch and diameter of the wheels were altered, the doors were changed from hollow to solid core, the steering system, stairway configuration, and the wheel house superstructure were also altered to meet D&S specs.[63] D&S was even given the opportunity to name the NGS-106, an offer which D&S deferred in favor of their new partners, the Owners, who decided to name the NGS-106 the "M/V Leisa" after Ben Strafuss' wife.[64] The NGS-106 was later renamed.[65] In addition, D&S expended time and moneys equipping the vessels with an aluminum service vessel, motor, and satellite compass for NGS-106.[66] Per the Agreement, D&S was required to supply, equip, and navigate the vessels.[67] According to Klotz, all modifications were agreed to by the Owners.[68]

In December of 2013, the Owners became aware that the shipyard might be delayed in completing the NGS-106, and the Owners would lose the accelerated depreciation, which was so important to them. In an attempt to advantage of so-called "gray" accounting practices to reduce

---

[59] Id.; Exhibit "U" – Deposition of Pat McDaniel at Pg. 32.
[60] Exhibit "E" – Email string regarding painting NGS-106 (D&S 177); Exhibit "U" – Deposition of Pat McDaniel at Pg. 369-372.
[61] Exhibit "U" – Deposition of Pat McDaniel at Pg. 352.
[62] Exhibit "W" – Deposition of Calvin Klotz at Pg. 36.
[63] Exhibit "U" – Deposition of Pat McDaniel at Pg. 353-355.
[64] Exhibit "U" – Deposition of Pat McDaniel at Pg. 355.
[65] Id.
[66] Exhibit "U" – Deposition of Pat McDaniel at Pg. 353.
[67] Exhibit "S" – Bareboat Charter Agreement at ¶ 1.
[68] Exhibit "W" – Deposition of Calvin Klotz at Pg. 140.

their tax burden for 2013, Strafuss and Klotz requested that D&S create false daily logs and a false revenue stream indicating the vessel was in service, despite the fact that the NGS-106 was not yet in condition to service the Canal Barge time charter agreement. [69] On December 10, 2013, Strafuss emails Klotz, along with others, discussing delivery of the NGS-106 and states "we need to get D&S to take delivery … this year and … under charter so we can qualify for the accelerated depreciation uniquely available until Jan 1. The boat will continue to be finished so we won't actually accept it as complete until sometime in February."[70] Despite clearly identifying D&S to be his "chosen" operator in his December 10 email, during his deposition, Strafuss stated that he needed the boat to produce revenues in 2013 but that he had not identified an operator for the vessels at this time.[71] Due to the obvious implications of tax fraud, D&S declined this offer.[72] According to McDaniel, if D&S had accepted this invitation to commit fraud, then D&S would have taken control of the NGS-106 in December.[73] Had this occurred, this lawsuit would have been completely unnecessary, although D&S and the Owners might be facing trial together as defendants for tax fraud.

In January of 2014, D&S continued its work pursuant to its Agreement by continuing to monitor construction and visiting the shipyard to equip the NGS with a satellite compass, which was paid for by D&S.[74] On January 31, McDaniel and Klotz exchanged documents for vessels and discussing execution of the written contract, which did not have "any other changes than we discussed on our last conversation" which occurred a few weeks prior.[75] Also on January 31, D&S

---

[69] Exhibit "I" - Emails between Ben Strafuss, Joe Gregory, and Calvin Klotz (Bates Defendant 00037-00042); Exhibit "H" - Emails between Ben Strafuss, Joe Gregory, and Calvin Klotz (Bates Defendant 00048); Exhibit "U" – Deposition of Pat McDaniel at Pg. 75, 393-394.
[70] Exhibit "G" - Emails from Ben Strafuss to Calvin Klotz and others (Bates Defendant 000129).
[71] Exhibit "T" – Deposition of Ben Strafuss at Pg. 126.
[72] Exhibit "H" - Emails between Ben Strafuss, Joe Gregory, and Calvin Klotz (Bates Defendant 00048);
[73] Deposition of Pat McDaniel at Pg. 395-396
[74] Exhibit "K" – Complete Marine Invoice (D&S-001); Exhibit "A" – NGS visitor log sheets at January 16 and 21.
[75] Exhibit "L" - Emails between Pat McDaniel and Calvin Klotz (Klotz 0007).

executed a written time charter agreement with Canal Barge Company thereby memorializing their prior oral time charter agreement.[76]

Without providing any update or information to D&S, Strafuss begins exploring other options for the NGS-106 and NGS-107. Soon after, Strafuss decided to take the vessels into a venture with a new company with Walter Blessey.[77] Strafuss did not bother to inform D&S or Klotz of his decision at this time. Rather, a few weeks go by without Strafuss providing any information. On February 14, 2014, McDaniel emailed a copy of the Canal Barge time charter agreement to Klotz, which had been executed January 31, 2013.[78] Klotz, who had recently learned that Strafuss was considering taking the vessels away from D&S, emails Strafuss the most telling email produced during discovery, which provided:

- Klotz stated that he hoped, as Pat hoped, that D&S would not lose out on both vessels.
- Klotz indicated that McDaniel thought that the Owners and D&S had "verbal and hand shake agreement." Klotz does not dispute this statement.
- Klotz references and attaches the written time charter agreement that D&S had entered with Canal Barge Co. and states that D&S was committed to Canal Barge to provide a vessel.
- Klotz states that the Owners modified the vessels to meet the needs of D&S.
- Klotz stated that he told McDaniel that "no firm decision has been made" with regard to whether the vessels would no longer be chartered to D&S.
- Klotz stated that he hopes, at the least, D&S would be able to operate the NGS-106.
- Klotz stated that "**we did move forward with D&S in August 2013** having numerous meetings and many contact (*sic*) and in fact **would not have signed second vessel on October 16, 2013 if we did not have [D&S] verbal commitment** to do a deal."
- Klotz stated, "I think we should try to honor the D&S deal…"
- Klotz indicated that he "always tried to walk in the customers (sic) shoes" and deal fairly with customers and that "we always thought D&S was a fair deal and moved forward with them for many months" in support of his statement that he "felt very strongly" about staying with D&S.
- With regard to D&S' obligations to provide power to its customers and procure additional vessels to increase their fleet, Klotz indicates that "Dean and Pat are in a bind."[79]

---

[76] Exhibit "O" - Emails between Pat McDaniel and Calvin Klotz (Klotz 16) with attached Time Charter Agreement.
[77] Exhibit "M" - Emails between Ben Strafuss and Walter Blessey (Defendant -000249); Exhibit "U" – Deposition of Pat McDaniel at Pg. 309, Ln. 1-12
[78] Exhibit "O" - Emails between Pat McDaniel and Calvin Klotz (Klotz 16).
[79] Exhibit "N" - Emails between Calvin Klotz and Ben Strafuss (Defendant-00055).

Klotz testified that at this time he was most concerned about the NGS-106 because of the pressing contract D&S had entered into with Canal Barge.[80] Klotz also confirmed his feelings in an email dated February 20, 2014, where he stated that "D&S had no issues working with us" and that he "had no idea we would not work with D&S as they were a strong reason we started the first boat and from our October meeting signed the second boat. I feel like we changed our minds and left them hanging…"[81] He continued that he did not agree with Strafuss' decision, that "D&S will not take this lightly," and he expected the worst.[82]

Sometime thereafter, D&S was informed that their Agreement with the Owners was not going to be honored based upon a decision by Strafuss. As indicated by the above referenced email and by deposition testimony, Klotz did not agree with Strafuss' decision to take the vessels away from D&S and he "felt bad about it."[83] Klotz stated that he was worried that he put D&S and Canal Barge "in a bind" due to the lack of availability of other vessels and the short notice provided by the Owners that neither D&S nor Canal Barge would operate the vessels, and Klotz was also worried that Canal Barge might file suit against D&S for breach of the time charter agreement.[84]

Eventually the NGS-106 was re-named the M/V Lisa Gail Strafuss and placed into Amis, LLC. According to the Louisiana Secretary of State corporate database, the sole members of Amis, LLC are Walter Blessey, Jr., Clark Todd, and Patrick Voss. Since the institution of this lawsuit, Strafuss has admitted that he also holds a membership interest in Amis, LLC.[85] According to Strafuss and Klotz deposition testimony, the ownership of Amis, LLC is as follows: Walter Blessey owns 50%, Ben Strafuss owns 40%, and Calvin Klotz owns 10%.[86]

---

[80] Exhibit "W" – Deposition of Calvin Klotz at Pg.120.
[81] Exhibit "R" - Emails between Calvin Klotz and Ben Strafuss (Defendant 000295-296).
[82] Id.
[83] Exhibit "W" – Deposition of Calvin Klotz at Pg.122.
[84] Exhibit "W" – Deposition of Calvin Klotz at Pg. 154-155.
[85] Rec. Doc. 23-1 ¶11.
[86] Exhibit "T" – Deposition of Ben Strafuss at Pg. 36; Exhibit "W" – Deposition of Calvin Klotz at Pg. 196.

In the Defendants' Memorandum in Support of Renewed Motion for Summary Judgment, the Defendants claim that "the first time they had any knowledge that D&S may have entered a time charter for the NGS-106 was on or after February 14, 2014…"[87] This statement is misleading and disingenuous and certainly creates a genuine issue of material fact, which precludes granting summary judgment in favor of the movers because according to Klotz he expected D&S to time-charter the vessels because all of the D&S vessels were time-chartered. In response to a question about whether D&S was required to time charter the vessels, Mr. Klotz's straightforward response was: "You got to do something with it."[88] Klotz also acknowledged that he knew the "ultimate goal" was for D&S to time charter the vessels, since all D&S vessels were time chartered.[89] Further, on December 10, 2013, both Klotz and Strafuss were part of an email string with New Generation Shipyard owner, Joe Gregory, who informed the Owners that D&S was inquiring as to purchasing fuel for the vessel because "[Kirby] requires you top off the tanks before placed into service.[90] In addition, on December 19, 2013, Derek Chiasson, a Whitney Bank representative, emailed both Klotz and Strafuss stating that "I had lunch with D&S Marine yesterday. We had a great conversations and it appears that they have an abundance of work from both Kirby and Canal barge. We find comfort in the fact that your contract should deliver as promised."[91] In explaining how Whitney Bank knew that D&S would operate the vessels, Klotz testified that the Owners told Whitney Bank about the D&S charter agreement because the bank wanted to know what the Owners were doing to operate the vessels.[92] Klotz believed that the Owners needed to have a bareboat agreement in place in order for Whitney Bank to issue a loan to the Owners.[93] Despite

---

[87] Renewed Motion for Summary Judgment (Rec. Doc. 94-2 at Pg. 22)
[88] Exhibit "W" – Deposition of Calvin Klotz at Pg. 107.
[89] Exhibit "W" – Deposition of Calvin Klotz at Pg. 151, Ln. 11-15.
[90] Exhibit "F" – Email string regarding fueling vessel for Kirby (Defendant 33-34).
[91] Exhibit "J" – Email from Derek Chiasson to Strafuss and Klotz (Defendant 365-366)
[92] Exhibit "W" – Deposition of Calvin Klotz at Pg. 179.
[93] Exhibit "W" – Deposition of Calvin Klotz at Pg. 24, Ln. 20 through Pg. 25, Ln. 3.

having written conversations from December 2013 which discuss D&S and their time charter customers who were going to operate the vessels' subject to the Agreement, the Owners now apparently claim ignorance of the time charter agreements until early February. Contrary to the Defendants' representation in their renewed summary judgment motion, McDaniel testified that he knew that Klotz was informed of both time charter agreements immediately, and in turn, he believed that Klotz relayed this information to Strafuss.[94]

During the time period the vessels were being constructed, D&S relied upon the Owners' representations, by word and conduct, that D&S would operate the NGS-106 and NGS-107. According to the Owners, the market for inland vessels was booming at that time, and there were not many build slots available.[95] Put simply, there just were not many suitable vessels available in the market, and there were not many slots available to purchase directly from shipyards otherwise.[96] Not surprisingly, D&S was unable to fulfil its commitments to Kirby and Canal Barge with other vessels due to the lack of available vessels within the requisite time periods. Klotz acknowledged that he does not believe D&S would have been able to get another vessel in time to fulfil its commitment to Canal Barge for the 106.[97]

Unfortunately, the Owners' representations also caused D&S missed out on other opportunities to continue to grow and expand its fleet because it D&S thought it would be operating the NGS-106 and NGS-107. Due to D&S high utilization rate, D&S has still been unable to construct enough vessels to keep up with its growing customer demand. Had D&S received the NGS-106 and NGS-107, they would have been able to fulfil their commitments to both Canal and

---

[94] Exhibit "U" – Deposition of Pat McDaniel at Pg. 109, Ln. 14-25; Pg. 112, Ln. 25 through Pg. 113, Ln. 8.
[95] Exhibit "T" – Deposition of Ben Strafuss at Pg. 69.
[96] Exhibit "T" – Deposition of Ben Strafuss at Pg. 154-155; Exhibit "W" – Deposition of Calvin Klotz at Pg.124.
[97] Exhibit "W" – Deposition of Calvin Klotz at Pg. 125.

Kirby, and D&S would still be seeking additional new vessels to increase their fleet and keep up with the growing demand of their customers.[98]

In their renewed motion for summary judgment, the Defendants contend that there were "150 modifications" made to the Agreement, and that these modifications should invalidate the Owners' tacit acceptance. Considering that each of these "modifications" is actually only a single strike of the keyboard, this contention is highly exaggerated. In addition, many of the so called modifications were actually referred to as mere "refinements" by Klotz during deposition. For example, the Defendants contend that changes to Paragraph 10 are significant, but in Klotz's opinion, these refinements merely define some of the terms "a little better."[99] McDaniel agreed that despite these "modifications," the scope of his agreement with Klotz never changed since its conception despite some changes to "verbiage."[100] Most importantly, any modifications to the written agreement actually reflected items which had been previously agreed upon orally by McDaniel and Klotz on behalf of their respective partners.[101]

## IV. SUMMARY JUDGMENT STANDARD

According to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate after adequate discovery if the depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[102] A fact is "material" if it may affect the outcome of the suit under governing law.[103] An

[98] Exhibit "U" – Deposition of Pat McDaniel at Pg. 360.
[99] Exhibit "W" – Deposition of Calvin Klotz at Pg. 77.
[100] Exhibit "U" – Deposition of Pat McDaniel at Pg. 243, Ln. 10-15.
[101] Exhibit "U" – Deposition of Pat McDaniel at Pg. 165, Ln. 23 through Pg. 166, Ln 21; Pg. 177, Ln. 1-6; Pg. 244, Ln. 6-9 and 13-15.
[102] Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Fed. R. Civ. P. 56.
[103] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

issue is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. Id. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[104] The moving party's burden is not satisfied by conclusory or unsubstantiated allegations or by a mere scintilla of evidence.[105]

If the movant has met its burden, the non-moving party must then come forward and establish specific material facts in dispute to survive summary judgment.[106] The non-moving party must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial.[107] If the record, as a whole, could not lead a rational trier of fact to find for the nonmoving party, then no genuine issue of material fact exits and the moving party is entitled to judgment as a matter of law.[108]

## V. FIXTURE AGREEMENTS AND ORAL AGREEMENTS FOR MARITIME BAREBOAT AGREEMENTS

Where issues arise concerning the formation of a charter party, they are resolved by applying federal maritime law, not the law of particular states, however, federal maritime law includes general principles of contract law and agency. Hornbeck Offshore Servs., LLC v. Fairfield Indus., Inc., CIV.A.09-2905, 2010 WL 2008971, at *2 (E.D. La. May 17, 2010) *citing* 2 T. Schoenbaum, Admiralty and Maritime Law § 11–2 (4th ed.2004). *See also* Greenslate v. Tenneco Oil Company, 623 F.Supp. 573, 575 (E.D.La.1985) ("It is well established that a charter agreement is a maritime contract whose interpretation is subject to the principles of federal maritime law."); Jambon & Associates, L.L.C. v. Seamar Divers, Inc., 2009 WL 2175980 at *6 (E.D.La.2009).

---

[104] Celotex at 323.
[105] Little v. Liquid Air Corp., 37 F.2d 1069, 1075 (5th Cir. 1994).
[106] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 571, 587 (1986).
[107] Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047 (5th Cir. 1996).
[108] Amoco Prod. Co. v. Horwell Energy, Inc., 969 F.2d 146, 147-48 (5th Cir. 1992).

Under general maritime law, oral contracts are generally regarded as valid. Sea-Land Serv., Inc. v. Sellan, 64 F.Supp.2d 1255 (S.D. Fla.1999) aff'd, 231 F.3d 848 (11th Cir.2000). Under maritime law, unsigned agreements are held enforceable where the parties have a meeting of the minds on the essential terms of their agreement. Id. The Federal courts, including the Eastern District, recognize that a charter agreement comes into existence when the parties have a meeting of the minds on the essential terms of the charter. E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia, 673 F.Supp. 796 (E.D. La.1987) aff'd, 876 F.2d 1168 (5th Cir.1989). A charter does not have to be signed to be legally binding, and oral charters are valid and enforceable. Id. As long as an oral charter is completed as to essential terms, a binding charter exists between the parties. Ne. Marine, Inc. v. M/V MASTER MORGAN, CIV. A. 95-1189, 1995 WL 591330, at *2 (E.D. La. Oct. 4, 1995) *citing* Agrico Chemical Co. v. M/V BEN W. MARTIN, 664 F.2d 85, 91 (5th Cir.1981); Hollinger v. Warrior Tombigbee Trans. Co., 572 F.Supp. 1291, 1295 (N.D.Miss.1983). Whether the parties have agreed to the essential terms of a charter is a question of fact to be resolved by considering the circumstances involved. Id. *citing* Thomas J. Schoenbaum, Admiralty and Maritime Law, § 11–1 at 169 (West 1994). The issue of the existence of an oral charter party is rarely appropriate for resolution in a motion for summary judgment. Id. Whenever there are conflicting accounts concerning the formation of a charter agreement, there are genuine issues of fact that must be resolved at trial. Id.

In addition to oral agreements, Maritime law recognizes a "fixture" agreements. "A charter party is formed when the parties have a meeting of the minds on the essential terms of the charter." Hornbeck Offshore Servs., LLC v. Fairfield Indus., Inc., CIV.A.09-2905, 2010 WL 2008971, at *2 (E.D. La. May 17, 2010) *citing* E.A.S.T. Inc. of Stamford Conn. v. M/V ALAIA, 673 F.Supp. 796, 799 (E.D.La.1987). This takes place in two stages. Id. *citing* P.E.P. Shipping (Scandinavia)

APS v. Noramco Shipping Corp., 1997 WL 358118 at *2 (E.D.La.1997); Great Circle Lines, LTD. v. Matheson & Co., LTD., 681 F.2d 121, 124 (2d. Cir.1982). First is an agreement on the "main" or "essential" terms of the charter. Great Circle, 681 F.2d at 125. This agreement is termed a "fixture." Id. The fixture itself is a binding contract, even if it is "subject to details." Id. Second, the parties negotiate the details, "amending the form contract specified in the 'fixture.' " Id. To determine whether a phrase such as "subject to details" in a fixture creates a condition subsequent to a binding agreement or simply an indication of the remaining topics for negotiation, courts must look to "the intent of the parties when viewed in a fair and reasonable manner under all circumstances." Id. at 126. The fixture formation rules stem from "long-standing customs and business practices of the shipping industry" in which "[c]harters are frequently negotiated with a sense of urgency and under severe time constraints." Schoenbaum, supra, § 11–2, p. 4.

Here, the evidence is clear that time was of the essence for the Owners, and the bareboat charterer had to begin operating the vessels immediately upon completion of construction. The sense of urgency in the case at hand was communicated from the Owners to D&S, and D&S did everything within its power to ensure that the needs of the Owners would be met. According to the testimony of Klotz and McDaniel, there is no doubt that D&S and the Owners agreed upon the core terms to the contract, ie., *inter alia*, the day rate, the term of the contract, and the object of the contract – the vessels, and the parties "moved forward" based upon their agreement upon these essential terms with the understanding that the remaining terms would be worked out at a later time. Accordingly, the parties reached a valid, binding fixture agreement for the vessels, which the Defendants breached by usurping the vessels into Amis, LLC. Alternatively, here as in E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia, the Defendants should be barred by the doctrine of promissory estoppel from denying the existence of a binding and enforceable charter agreement

because D&S has relief to its detriment upon the Owner's conduct by time chartering the vessels to third parties, expending funds to equip, and otherwise expending time and man hours monitoring construction and modifications to the vessels.

## VI. ORAL AGREEMENTS AND TACIT ACCEPTANCE PURSUANT TO LOUISIANA LAW

Louisiana law also recognizes and enforces oral agreements. For oral contracts in excess of $500.00, the contract must be proved by one witness and other corroborating circumstances. La. C.C. art. 1846. The Plaintiff himself may serve as the witness to establish the existence of the oral contract in excess of $500. Suire v. Lafayette City-Par. Consol. Gov't, 2004-1459 (La. 4/12/05); 907 So.2d 37. The other corroborating circumstances required to prove an oral contract in excess of $500 need only be general in nature; independent proof of every detail of the agreement is not required, but the other corroboration must come from a source other than the plaintiff. Id.

Here, according to Klotz, the parties agreed the lease the vessels for an initial day rate of $850/day for the first five-year term and a "second half" day rate of $900/ day for the second five-year term.[109] Therefore, the parties' oral agreement constitutes a valid, binding contract of lease pursuant to Louisiana law. In addition, Louisiana law holds that the terms of a written contract may be accepted, despite the fact that the written contract was not executed, whenever the obligee begins performance in furtherance of the contract and the obligor has knowledge of the performance and fails to object. This area of law was previously reviewed by this Court in its Order and Reasons denying the Defendants' Motion to Dismiss (Rec. Doc. 74). The Court reviewed and discussed the rebuttable presumption provided by Louisiana Civil Code Article 1947, which is that whenever parties to a contract have contemplated a certain form, it is presumed the parties do not

[109] Exhibit "W" – Deposition of Calvin Klotz at Pg. 51.

intend to be bound until the contract is executed in that form.[110] The Court, in citing Myers v. Burger King Corp.[111], found that the presumption created by Article 1947 can be rebutted by demonstrating that the parties tacitly accepted the terms agreed upon by beginning performance.[112] In Burger King, the Louisiana Fifth Circuit Court of Appeal found that a contract was binding, even though a certain form was previously contemplated by the parties and the contract was never reduced to the contemplated form, because the owner tacitly accepted the contract by allowing the contractor to begin work.[113] In comparing the affidavits submitted by D&S with a February 17, 2014 email from Calvin Klotz to Ben Strafuss, the Court found that genuine issues of material fact existed "regarding what steps D&S Marine took in performance of the contract it believed it had with S&K Marine, and whether S&K Marine knew about those actions so as to effectuate S&K Marine's tacit acceptance of the contract regardless of whether it was in the contemplated written form."[114]

Klotz states the following, with regard to how D&S had commenced under the Agreement:

- D&S had been working with Strafuss, Klotz, and S&K since "day one" helping with work at the shipyard;[115]
- We (Strafuss, Klotz, and S&K) did "move forward" with D&S in August 2013;[116]
- We (Strafuss, Klotz, and S&K) would not have been able to acquire the second vessel on October 16, 2013 without a commitment from D&S;[117] and
- "I think we always thought D&S was a fair deal and moved forward with them for many months."[118]

With regard to the Agreement between the Parties, Klotz states:

- "[D&S] thought we had a verbal and handshake agreement."[119]

[110] Rec. Doc. 35 at p. 7.
[111] Meyers v. Burger King Corp., 618 So.2d 1123 (La. Ct. App. 1993).
[112] Rec. Doc. 35 at p. 8.
[113] Meyers, *supra*.
[114] Order and Reasons (Rec. Doc. 74).
[115] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055") at ¶ 1.
[116] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055") at ¶ 2.
[117] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055") at ¶ 2.
[118] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055") at ¶ 3.
[119] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055") at ¶ 1.

- "I think we should try to honor the D&S deal…"[120]
- "I have always tried to walk in the customers (*sic*) shoes and do [what] I think is fair in dealing with customers. I think we always thought D&S was a fair deal and moved forward with them for many months."[121]
- "I feel very strongly about staying with D&S…"[122]

Despite the above email from his partner, Strafuss evidently decided that he was not going to "honor" their agreement with D&S. Further, it seems clear that once New Generation Shipyard was unable to meet their deadline for NGS-106 and Strafuss was not going to receive the tax incentives he so desired, then D&S was no longer valuable to Strafuss, and Strafuss decided to take another deal, which was devised in February of 2014 with Walter Blessey.

Strafuss enjoyed the fruits of D&S's labor and would not have acquired the second vessel, NGS-107, without D&S's commitment and support. Strafuss was also keenly aware that D&S was required to make commitments to its customers Kirby Inland Marine and Canal Barge Company for these vessels, and that D&S management would be "in a bind" should Strafuss decide to not honor the Parties' Agreement.[123] Now, Strafuss conveniently takes the position that there was no contract between the Parties and has taken both vessels into a new company for a deal he believed to be more lucrative. In their motion, the Defendants also try to downplay the work performed by D&S as being "*de minimis.*"[124] The testimony of McDaniel and the other evidence submitted in support of this opposition show that the work performed by D&S was substantial, and at the very least, there is now genuine issue of material fact regarding the nature and substance of the work performed by D&S.[125]

---

[120] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055") at ¶ 2.
[121] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055") at ¶ 3.
[122] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055") at ¶ 3.
[123] Exhibit "P" – February 17, 2014 email from Calvin Klotz to Ben Strafuss (Bates No. "Defendant -00055") at ¶ 3.
[124] *See* Memorandum in Support of Renewed Motion for Summary Judgment (Rec. Doc. 94-2 at Pg. 7 of 30, Pg. 8 of 30, and Pg. 27 of 30);
[125] Exhibit "U" – Deposition of Pat McDaniel at Pg. 103, Ln. 13 through Pg. 104, Ln.12.

In stark contrast to the to the claims by the Defendants' renewed summary judgment motion, the evidence submitted by the Plaintiff in this opposition indicates that 1) D&S commenced work under the Agreement by expending funds to equip NGS-106 and entering time charter agreements with Canal Barge Company and Kirby Inland Marine for NGS-106 and NGS-107, respectively; and 2) the Defendants knew, encouraged and needed D&S to commence work on or before October 16, 2013. This constitutes tacit acceptance of the Agreement on behalf of the Defendants. At worst, there are genuine issues of material fact regarding the extent of the work performed by D&S and relating to the Owners knowledge and failure to object to said work. Accordingly, the Defendants' motion for summary judgment must be denied.

## VII. CONCLUSION

Here, there is no doubt that D&S commenced work under the Agreement with S&K, and a simple review of the email from Klotz to Strafuss attached hereto as Exhibit "A" indicates that Strafuss, Klotz, and S&K had knowledge that D&S had commenced work by October 16, 2013 at the absolute latest. Accordingly, genuine issues of material fact exist which preclude granting the Defendants' Renewed Motion for Summary Judgment.

Respectfully submitted;

CHRISTOPHER H. RIVIERE
A Professional Law Corporation

*/s/ William N. Abel*
CHRISTOPHER H. RIVIERE (#11297), T.A.
WILLIAM N. ABEL (#33702)
A Professional Law Corporation
103 West Third Street
Post Office Box 670
Thibodaux, Louisiana 70302-0670
Telephone: 985-447-7440
Facsimile: 985-447-3233
Attorneys for D&S Marine Transportation, LLC

**CERTIFICATE**

I hereby certify that on this 19th day of April, 2016, a copy of the above and foregoing was filed electronically with the Clerk of Court/ECF System. Notice of this filing will be sent by operation of the court's electronic filing system.

*/s/ William N. Abel*