UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| D & S MARINE TRANSPORTATION, LLC | CIVIL ACTION |
| VERSUS | NO:  14-2048 |
| S & K MARINE, LLC, ET AL. | SECTION: "S" (4) |

ORDER AND REASONS

IT IS HEREBY ORDERED that Defendants' Renewed Motion to for Summary Judgment
(Doc. #94) is DENIED.

BACKGROUND

This matter is before the court on a renewed motion for summary judgment filed by

defendants, S & K Marine, L.L.C. and Ben Strafuss.

Plaintiff, D & S Marine Transportation, LLC, is a marine transportation company that

operates a fleet of tow boats that move barges.  Its vessels are time chartered to other companies.

D & S Marine alleges that in 2013, before the formation of S & K Marine,[1] one of its owners, Pat

McDaniel, engaged in discussions with Calvin Klotz, who would become a member of S & K

Marine, "leading to an initial agreement" regarding two vessels under construction at New

Generations Shipyard that were to be owned by S & K Marine, and operated by D & S Marine.  D

& S Marine alleges that it entered into a bareboat charter agreement with S & K Marine regarding

the vessels, and that S & K Marine breached that contract in bad faith.  As to the formation of the

contract, D & S Marine alleges that:

> [t]he parties entered into a bareboat charter agreement establishing a
> fixture by agreeing on essential terms of the charter such as the rate,

---

[1] S & K Marine was registered with the Louisiana Secretary of State on December 11, 2013, as a
limited liability company.  Calvin Klotz and Ben Strafuss are members of S & K Marine.

> initial term of five (5) years with option to extend for another five (5) year term, vessel maintenance, and option to purchase after the initial term, all while working out remaining details to finalize agreement.

D & S Marine also alleges in the complaint that the parties continued to "refine minor details of their agreement through February 2014," and that, with defendants' consent, it "undertook a significant amount of work with the shipyard to modify the vessel under construction to meet the configurations required and used in [its] fleet." McDaniel testified at his deposition that sometime in July or August 2013, D & S Marine entered into an oral bareboat charter agreement with Klotz and Strafuss.

McDaniel testified that on November 4, 2013, he outlined the essential terms of the charter agreement in an email to D & S Marine's external attorney, and asked the attorney to draft a bareboat charter agreement. These terms included a five-year term and five-year renewal option of the charter party, a purchase option, an $850.00 daily charter rate, and that D & S Marine would supply all fuel, lube and related taxes, would crew and maintain the vessel, and carry vessel insurance. McDaniel testified that Klotz and Strafuss requested that D & S Marine undertake to draft an agreement that could be marked up as needed. McDaniel sent the first draft to Strafuss on November 19, 2013.

On December 10, 2013, Strafuss emailed Klotz and S & K Marine's attorneys regarding sales and use tax for the vessel, a revised agreement, delivery of the vessel, insurance, documentation and the charter agreement. As to delivery of the vessel, Strafuss stated that "we need to get D&S to take delivery yet this year and out it under charter so we can qualify for the accelerated depreciation uniquely available until Jan 1. The boat will continue to be finished and so we won't actually accept it as compete until sometime in February."

On December 11, 2013, Klotz returned a redline version of the bareboat charter agreement to McDaniel.  Significantly, this version added a paragraph regarding the assignment of warranty or guarantee rights, and added or changed language in the paragraphs regarding taxes, maritime liens, sub-charter agreements, limitation of liability, the right of first refusal and the purchase option.

After D & S Marine received Strafuss and Klotz's December 11, 2013, redline version of the draft bareboat charter agreement, D & S Marine and its attorney modified the draft several times. On January 31, 2014, McDaniel sent an email to Klotz stating that they "should finalize the contract next week as [McDaniel] will send [Klotz] a copy to review."  McDaniel also indicated that he did not think that there were any other changes other than those that were previously discussed.  Klotz replied that they would meet the following week to finalize the contract.  Also on January 31, 2014, D & S Marine entered into a time charter agreement with Canal Barge Co., one of its customers, for one of the vessels under construction that was the subject of the alleged bareboat charter agreement.

On February 10, 2014, McDaniel sent an email to Klotz stating that D & S Marine's attorney "is sending over a final version [of the bareboat charter agreement] today, as we will get it to you shortly for review. I think we are done??"  That same day, McDaniel sent the draft to Klotz via email with the note: "Attached should be the latest Bareboat Charter with all needed changes?  Please review and let us know if you should have any questions."  This draft had changes from December 11, 2013, draft.  Specifically, the February 10, 2014, draft increased the charter rate for the second five-year term to $900 per day; changed the formula for calculating the purchase price in right of first refusal clause; and, left out the purchase option clause.  This draft also added provisions that: the owner warranted certain aspects of the vessel's construction and would assume the responsibility for and the expense of repairing certain items if defects were discovered within one year of delivery

of the vessel; prevented the owner from creating liens on the vessel except for one first preferred ship mortgage; and, changed the provision regarding the additional lease option for another vessel to include terms for purchasing that vessel.

D & S Marine alleges that between February 10, 2014, and February 14, 2014, Strafuss met with Walter Blessey, Chairman and CEO of Blessey Marine Services, Inc., and thereafter informed Klotz that "he would be chartering the vessels to Blessey Marine Services, Inc."  D & S Marine claims that it "became aware the charter agreement [that it had with S & K Marine] was breached when workers at [the shipyard] informed [it] that major changes had been ordered on the vessel."

On February 17, 2014, Klotz sent an email to Strafuss in which Klotz discussed the alleged bareboat charter agreement with D & S Marine and the proposed deal with Blessey.  Klotz compared the two, and concluded that "both deals are good."  However, Klotz states that he would prefer to charter the first vessel to D & S Marine, and offer the second vessel to Blessey.  Klotz informed Strafuss that he spoke with McDaniel over the telephone and that McDaniel "was very upset if [S & K Marine] did not go through with the bareboat charter with D&S and thought [they] had a verbal and hand shake agreement."  Klotz also said that D &S Marine has "been working with [S & K Marine] since day one helping with the yard and [S & K Marine] even ordered the wheels and gears to meet [D & S Marine's] needs among other things."  Further, Klotz says "we did move forward with D&S in August 2013 having numerous meetings and many contact[s] and in fact would not have signed second vessel on October 16, 2013[,] if we did not have their verbal commitment to do a deal . . . I think we should try to honor the D&S deal on boat #1 . . . we always thought D&S was a fair deal and moved forward with them for many months."

On February 18, 2014, Strafuss sent an email to Klotz explaining why he thought that making a deal with Blessey was a better option than working with D & S Marine.   He also stated that his "straightforward view is that [D & S Marine] did not accept [S & K Maine's] proposal," and that they "were not able to work out an acceptable contract by the end of the year."  Strafuss stated that he wanted to accept Blessey's offer because he "personally took all the risk and put up 100% of the money," and Blessey is a "very loyal customer and friend" that made a "much better offer." On February 20, 2014, Strafuss sent another email to Klotz in which he reiterated that "D&S rejected the terms [S & K Marine] offered and thus we did not come to terms and thus I moved on."

D & S Marine filed this action against defendants in the Thirty-Second Judicial District Court, Parish of Terrebonne, State of Louisiana alleging that defendants breached a bareboat charter agreement entered into between D & S Marine and S & K Marine.  D & S Marine also alleges that defendants breached that contract in bad faith, that Strafuss committed an intentional interference with contractual relations, and that defendants are liable for detrimental reliance.  Defendants removed the action to the United States District Court for the Eastern District of Louisiana. Defendants filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure arguing that D & S Marine failed to state any viable claims under either Louisiana law or the general maritime law.

Applying Louisiana law, this court denied the motion to dismiss as to D & S Marine's breach of contract, bad faith breach of contract, and detrimental reliance claims against S & K Marine, and its tortious interference with contractual relations claim against Strafuss.[2]  The court found that the

---

[2]  The court granted the motion as to D & S Marine's breach of contract, bad faith breach of contract, and detrimental reliance claims against Strafuss and BJS Blessey, L.L.C.

parties contemplated that the final bareboat charter agreement would be in writing and signed by the parties, which did not occur.  However, the court also found that by alleging that it "undertook a significant amount of work with the shipyard to modify the vessel under construction to meet the configurations required and used in [its] fleet[,]" D & S Marine alleged that it began performance under the bareboat charter agreement by spending money to make modifications to the vessel while it was under construction.  Thus, the court found that this, along with the other pertinent allegations in the complaint, was sufficient for D & S Marine to state claims for breach of contract and bad faith breach of contract against S & K Marine, and for tortious interference with contractual relations against Strafuss.  Further, the court found that D & S Marine sufficiently stated a claim for detrimental reliance against S & K Marine, because it alleged that it relied on S & K Marine's word and conduct regarding the formation of the charter agreement, and alleged that D & S Marine changed its position to its detriment by spending money to modify the vessel under construction and by entering into a sub-charter agreement with one of its customers.

Thereafter, S & K Marine and Strafuss filed a motion for summary judgment arguing that all remaining claims against them must be dismissed because the only remaining issue was whether D & S Marine spent money modifying the vessel, which it did not.  To support their argument, defendants filed the affidavits of Wilton Joseph Gregory, the owner of New Generations Shipyard, and Strafuss. Gregory declared that D & S Marine did not have any agreements with the shipyard related to the vessel or pay for any modifications to the vessel; Strafuss paid for the slot where the vessel was being constructed, and 100% of the vessel, including all modifications to it; and, Strafuss and Klotz, with Strafuss' approval, had the sole and exclusive authority to order any changes to the vessel.  Strafuss similarly declared that he personally paid for 100% of the vessel, including all

6

modifications; D & S Marine did not pay for any modifications to the vessel; he had the sole and exclusive authority over any changes to the vessel; and, he made all modifications because he "desired and authorized" them, regardless of whether D & S Marine also wanted any such modifications.

In opposition, D & S Marine argued that it "commenced work" under the bareboat charter agreement. D & S Marine submitted the affidavits of Dean Cheramie, an owner of D & S Marine, and McDaniel in which they declared that D & S Marine began working with Klotz on the bareboat charter agreement in June or July 2013, and that the parties "reached an agreement to bareboat charter the vessels" sometime before October 16, 2013. They both stated that D & S Marine "commenced work immediately to ensure the vessels were prepared to begin working upon their completion," which included "expend[ing] funds to equip [the vessel] with an aluminum service vessel, motor and satellite compass." McDaniel stated that he made "many visits to New Generation Shipyard to view and discuss ongoing progress and delays of the vessel building, modification, and change orders with [Gregory] and meeting, negotiating, and entering into time charter agreement[s] with Kirby Inland Marine and Canal Barge Co." McDaniel and Cheramie also declared that S & K Marine knew of and encouraged the actions that they claim D & S Marine took in furtherance of the bareboat charter agreement. Specifically, McDaniel and Cheramie both declared that the bareboat charter agreement was necessary to S & K Marine's decision to purchase the vessels because S & K Marine needed D & S Marine to ensure that the vessels would be working immediately upon their completion. D & S Marine also cited Klotz's February 17, 2014, email to Strafuss as evidence that D & S Marine and S & K Marine had entered into the bareboat charter agreement.

7

The court denied the motion finding that the countervailing affidavits and Klotz's February 17, 2014, email to Strafuss demonstrated that there were disputed issues of fact regarding what steps D & S Marine took in performance of the contract it believed it had with S & K Marine, and whether S & K Marine knew about those actions so as to effectuate S & K Marine's tacit acceptance of the contract regardless of whether it was in the contemplated written form.  In ruling on the first motion for summary judgment, the court assumed that the parties had reached an agreement as to the essential terms of the bareboat charter agreement. S & K Marine limited its argument to the issue whether D & S Marine spent any money modifying the vessel. The parties did not argue or submit any evidence regarding whether an agreement was actually reached as to the contract's essential terms.

After engaging in discovery, defendants filed the instant renewed motion for summary judgment.  S & K Marine argues that D & S Marine cannot prevail on its breach of contract claim, or the related bad faith breach of contract claim because the evidence demonstrates that the parties never formed a contract due to a lack of consent.  S & K Marine argues that the exchange of multiple draft contracts in which essential terms, such as the charter rate, fuel requirements, maintenance, and purchase option, were changed demonstrates that there was never a meeting of the minds, which is required to form a contract.  Thus, S & K Marine argues that it could not have tacitly accepted the terms of the unexecuted charter party.  S & K Marine also argues that D & S Marine's detrimental reliance claim must be dismissed because D & S Marine was unreasonable in its alleged reliance on any purported promises due to the back-and-forth nature of the contract negotiations.  Further, Strafuss argues that the tortious interference with contractual relations claim against him must be dismissed because there was no contract.

D & S Marine argues that there was an oral contract because McDaniel and Klotz agreed upon the contract's essential items of the charter rate and five year term.  D & S Marine argues that, although there was never an executed written contract, S & K Marine tacitly accepted the terms of the agreement by allowing D & S Marine to begin work under the contract.

## ANALYSIS

### A.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Granting a motion for summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits filed in support of the motion demonstrate that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2509-10 (1986).  The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson, 106 S.Ct. at 2510).

If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the

opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

**B.      D & S Marine's Breach of Contract and Bad Faith Breach of Contract Claims against S & K Marine**

In its renewed motion for summary judgment, S & K Marine argues that there was never a contract that it could have tacitly accepted because there was never an agreement as to the essential terms. Thus, there was no consent, or "meeting of the minds."

Under Louisiana law, "[a] contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906.   The formation of a valid contract requires: (1) capacity to contract; (2) mutual consent; (3) a certain object; and, (4) a lawful purpose. Id. at arts. 1918, 1927, 1966, and 1971.  There is no dispute in this matter regarding capacity, object and lawful purpose.  The parties disagree about whether there was mutual consent.

Consent of the parties to a contract is established through offer and acceptance. Id. at art. 1927. To be an enforceable contract, there must be a meeting of the minds. Read v. Willwoods Cmty., 165 So.3d 883, 887 (La. 2015).  "[W]here there is no meeting of the minds between the parties the contract is void for lack of consent." Mark A. Gravel Properties, LLC v. Eddie's BBQ, LLC, 139 So.3d 653, 657 (La. Ct. App. 2014) (quoting Phillips v. Berner, 789 So.2d 41, 45 (La. Ct. App. 2001)).

"Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." La. Civ. Code art. 1927.  Further, "[u]nless otherwise specified in the offer,

there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made." Id. However, "[w]hen, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form." Id. at art. 1947. The presumption created by Article 1947 can be rebutted by demonstrating that the parties tacitly accepted the agreed upon terms by beginning performance. See Myers v. Burger King Corp., 618 So.2d 1123 (La. Ct. App. 1993).

A party claiming the existence of a contract has the burden of proving that the contract was perfected. Id. at art. 1831. An oral contract valued in excess of $500 must be proved by at least one witness and other corroborating circumstances. Id. at 1846.

D & S Marine argues that the parties entered into an oral contract when McDaniel and Klotz agreed that the charter rate would be $850 for the first five-year term.[3] It argues that Klotz testified at his deposition that these terms were agreed upon at the outset. D & S Marine contends that the rest of the contract terms were details that would be worked out later. Further, D & S Marine argues that S & K Marine tacitly accepted the terms of the oral contract by permitting D & S Marine to begin work to ensure that the vessels would be prepared to begin working upon their completion. D & S Marine claims that such work included purchasing an aluminum service vessel motor and satellite compass; McDaniel's visiting the shipyard to view and discuss ongoing progress and delays of the vessel building, modification, and change orders; and, McDaniel's meeting, negotiating, and entering into time charter agreements with Kirby Inland Marine and Canal Barge Co. Further, the

_____

[3] D & S Marine also argues that an agreement between McDaniel and Klotz as to the essential terms of the bareboat charter agreement established a "fixture," or binding contract subject to details, under the general maritime law. In ruling on defendants' motion to dismiss, this court found that Louisiana law, not the general maritime law, applies because the vessels were under construction. See Doc. #35.

shipyard began adapting one of the vessels to fit D & S Marine's specifications, such as painting the vessel with D & S Marine's color scheme.

D & S Marine has established, as confirmed by Klotz's deposition testimony, that the parties agreed at the outset that the term of the proposed charter party would be five years and that the charter rate would be $850 per day for the first five years.  Klotz testified at his deposition that it was necessary to have a basic agreement on "high-level" items to begin negotiating the contract as a whole.  He also testified that the charter rate for the first five-year term was agreed upon at the outset, but the parties continued to negotiate the charter rate for the second-five year term and that taxes were not discussed until much later.  Further, McDaniel testified that there was intent to include the purchase option as "an agreement of [the] partnership," but that the details were being negotiated. The initial term of five years and the $850 per day charter rate for that term were the essential terms of the alleged contract, and they remained consistent as written drafts of the bareboat charter agreement were exchanged.  Although other terms changed, such as the charter rate for the optional second five year term, the right of first refusal and the purchase option, there is a genuine issue of fact as to whether those terms were essential and material to the contract considering that they would not be implicated until five years into the charter party.

Klotz's testified that there was no oral contract and that he did not have authority to make, and never entered into, a final bareboat charter agreement with D & S Marine.  Further, Strafuss testified at his deposition that Klotz's role was to "flesh-out some negotiating levels" and that D & S Marine knew that Strafuss was making the final decision because he was "writing all the checks." However, Klotz appeared to be the person that was doing most of the negotiating on S & K Marine's behalf.  Indeed, D & S Marine claims that McDaniel and Klotz entered into the alleged oral contract.

McDaniel testified that there was an agreement between him, Dean Cheramie, Klotz and Strafuss to charter the vessels, the scope of which never changed while the "bells and whistles" were negotiated, and that D & S Marine was committed and prepared to take delivery of the vessels upon completion. Strafuss's December 10, 2013, email in which he discusses D & S Marine taking delivery of the vessel indicates that he may have thought that there was a contract, and McDaniel testified that he believed Klotz relayed the information about the contract formation and sub-charter agreements to Strafuss. Thus, there are disputed issues of material fact of whether Klotz had apparent authority to act on S & K Marine's behalf in forming the alleged oral contract, and whether all parties believed that there was an oral contract.

In ruling on S & K Marine's prior motion for summary judgment, the court, assuming that there was an oral contract, held that there were disputed issues of fact regarding whether S & K Marine tacitly accepted that alleged oral contract. Here, the court finds that there are disputed issue of fact regarding whether there was an oral contract. Therefore, S & K Marine's motion for summary judgment is DENIED as to the breach of contract and bad faith breach of contract claims.

## C.    D & S Marine's Tortious Interference with Contractual Relations Claim against Strafuss

Strafuss argues that D & S Marine cannot sustain a claim against him for intentional interference with a contract because there was no contract.

In 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 234 (La. 1989), the Supreme Court of Louisiana recognized a limited cause of action for tortious interference with contractual relations that pertains "only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." The elements of the cause of action are:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

Id. at 234.

Because the court finds that there are disputed issues of fact regarding whether an oral contract was formed, Strafuss's motion for summary judgment on this claim is DENIED.

**D.    D & S Marine's Detrimental Reliance Claim against S &K Marine**

S & K Marine argues that D & S Marine cannot sustain a cause of action for detrimental reliance because D & S Marine's reliance on any alleged promises made by S & K Marine was unreasonable in light of the back-and-forth nature of the contract negotiations.

The doctrine of detrimental reliance is provided in Louisiana Civil Code article 1967, which states:

> Cause is the reason why a party obligates himself. A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

There are three elements required for the application of the doctrine of detrimental reliance: (1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance. Morris v. Friedman, 663 So.2d 19, 25 (La. 1995). "[T]he basis of detrimental reliance is 'the idea that a person should not harm another person by making promises that he will not keep.'" Suire v. Lafayette City-Parish Consol. Gov't, 907 So.2d 37, 59 (La.

2005). "Thus, the focus of analysis of a detrimental reliance claim is . . . whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment." Id. It is not necessary for a plaintiff to establish the existence of an enforceable contract to recover for detrimental reliance. Rogers v. Brooks, 122 Fed. Appx. 729, 732 (5th Cir. 2004) (citing Newport Ltd. v Sears, Roebuck & Co., 6 F.3d 1058, 1069 (5th Cir. 1993)).  However, reliance on an alleged promise is unreasonable when the parties anticipate entering into a written agreement and negotiate the terms of a written agreement that were not mutually agreeable. Id.

Although D & S Marine and S & K Marine anticipated entering into a written bareboat charter agreement, McDaniel and Klotz reached an agreement as to the essential terms of the five year term and with a daily charter rate of $850. For months the parties proceeded under the premise that these terms were agreed upon. In his February 17, 2014, email to Strafuss, Klotz stated that D & S thought "they had a verbal and hand shake agreement" and that S & K Marine had been moving forward with D & S Marine for months. Thus, there are genuine issues of material fact regarding whether D & S Marine reasonably relied on representations made by S & K Marine. Therefore, S & K Marine's motion for summary judgment is DENIED as to D & S Marine's detrimental reliance claim.

## CONCLUSION

**IT IS HEREBY ORDERED** that Defendants' Renewed Motion to for Summary Judgment (Doc. #94) is **DENIED.**

New Orleans, Louisiana, this  27th  day of June, 2016.

_____

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**