## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **D & S MARINE TRANSPORTATION, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO:  14-2048** |
| **S & K MARINE, LLC, ET AL.** | **SECTION: "S" (4)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, D & S Marine Transportation, LLC, filed this suit against defendants, S & K Marine, LLC and Ben Strafuss, alleging breach of contract, bad faith breach of contract, and detrimental reliance claims against S & K Marine, and a tortious interference with contractual relations claim against Strafuss.[1]   On September 12, 2016, the matter came before the court for a bench trial.  At the close of D & S Marine Transportation's presentation of evidence, defendants moved for judgment on partial findings under Rule 52(c) of the Federal Rules of Civil Procedure. The court deferred ruling on the motion to allow the parties to file post-trial memoranda.  After considering the evidence presented at trial, and the parties' post-trial memoranda,

**IT IS HEREBY ORDERED** that Defendants' Motion for Judgment on Partial Findings under Rule 52(c) of the Federal Rules of Civil Procedure is **GRANTED**, and D & S Marine Transportation's remaining claims are **DISMISSED WITH PREJUDICE**.

## DISCUSSION

### I.      Background

D & S Marine Transportation and its sister company, D & S Marine Service, L.L.C., are marine transportation companies that operate a fleet of tow boats that move barges.  The D & S

---

[1]   D & S Marine also alleged breach of contract, bad faith breach of contract, and detrimental reliance claims against Strafuss and BJS Blessey, L.L.C.  The court dismissed those claims prior to trial.  See Doc. # 35.

Marine entities' vessels are time chartered to other companies.  D & S Marine Transportation alleges that in 2013 one of its owners, Patrick McDaniel, engaged in negotiations with Calvin Klotz, who was purportedly acting on behalf of the yet-to-be-formed S & K Marine, "leading to an initial agreement" regarding two vessels under construction at New Generations Shipyard, the NGS 106 and NGS 107.  The vessels were to be owned by S & K Marine, and operated under bareboat charter agreements with either D & S Marine Transportation or D & S Marine Service.  D & S Marine Transportation alleges that it entered into a bareboat charter agreement with S & K Marine regarding the vessels.  S & K Marine denies that a final bareboat charter agreement was ever entered into.

D & S Marine Transportation filed this action against defendants, S & K Marine, Strafuss and BJS Blessey, L.L.C., in the Thirty-Second Judicial District Court, Parish of Terrebonne, State of Louisiana, alleging that defendants are liable to D & S Marine Transportation for the breach of the bareboat charter agreement, the bad faith breach of the bareboat charter agreement, and detrimental reliance.  D & S Marine Transportation also alleged that Strafuss committed an intentional interference with contractual relations.  Defendants removed the action to the United States District Court for the Eastern District of Louisiana.

Defendants filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure arguing that D & S Marine Transportation failed to state any viable claims under either Louisiana law or the general maritime law.  Applying Louisiana law, this court granted the motion as to D & S Marine Transportation's breach of contract, bad faith breach of contract, and detrimental reliance claims against Strafuss and BJS Blessey.  The court denied the motion as to D & S Marine

2

Transportation's breach of contract, bad faith breach of contract, and detrimental reliance claims against S & K Marine, and its tortious interference with contractual relations claim against Strafuss.

The court found that the parties contemplated that the final bareboat charter agreement would be in writing and signed by the parties, which did not occur.  However, the court also found that by alleging that it "undertook a significant amount of work with the shipyard to modify the vessel under construction to meet the configurations required and used in [its] fleet[,]" D & S Marine Transportation alleged that it began performance under the bareboat charter agreement by spending money to make modifications to the vessel while it was under construction.  Thus, the court found that this, along with the other pertinent allegations in the complaint, was sufficient for D & S Marine Transportation to state claims for breach of contract and bad faith breach of contract against S & K Marine, and for tortious interference with contractual relations against Strafuss.  Further, the court found that D & S Marine Transportation sufficiently stated a claim for detrimental reliance against S & K Marine, because it alleged that it relied on S & K Marine's word and conduct regarding the formation of the bareboat charter agreement, and alleged that D & S Marine Transportation changed its position to its own detriment by spending money to modify the vessel under construction and by entering into a sub-charter agreement with another customer.

Thereafter, S & K Marine and Strafuss filed a motion for summary judgment arguing that all remaining claims against them must be dismissed because the only remaining issue was whether D & S Marine Transportation spent money modifying the vessel, which it did not.  After considering the countervailing affidavits submitted by the parties attesting to what D & S Marine Transportation did or did not spend with respect to the vessel and other evidence presented, the court denied the motion finding that there were genuine issues of material fact in dispute regarding what steps D &

S Marine Transportation took in performance of the bareboat charter agreement it believed it had with S & K Marine, and whether S & K Marine knew about those actions so as to effectuate S & K Marine's tacit acceptance of the contract regardless of whether it was in the contemplated written form.

In ruling on the first motion for summary judgment, the court assumed that the parties had reached an agreement as to the essential terms of the bareboat charter agreement because S & K Marine limited its argument to the issue whether D & S Marine Transportation spent any money modifying the vessel. The parties did not argue or submit any evidence regarding whether an agreement was actually reached as to the contract's essential terms.

After engaging in discovery, defendants filed a renewed motion for summary judgment. S & K Marine argued that D & S Marine Transportation could not prevail on its breach of contract claim, or the related bad faith breach of contract claim, because the exchange of multiple draft contracts in which essential terms, such as the charter rate, fuel requirements, maintenance, and purchase option, were changed demonstrated that there was never a meeting of the minds so it could not have tacitly accepted the terms of the unexecuted bareboat charter agreement. S & K Marine also argued that D & S Marine Transportation's detrimental reliance claim must be dismissed because D & S Marine Transportation was unreasonable in its alleged reliance on any purported promises due to the back-and-forth nature of the contract negotiations. Further, Strafuss argued that the tortious interference with contractual relations claim against him must be dismissed because there was no contract. D & S Marine Transportation argued that there was an oral contract because McDaniel and Klotz agreed upon the essential items of the bareboat charter agreement, specifically, the charter rate and five-year term. D & S Marine Transportation argued that, although there was

never an executed written contract, S & K Marine tacitly accepted the terms of the agreement by allowing D & S Marine Transportation to begin work under the contract.  The court denied the motion finding that there were disputed issue of material fact regarding whether there was an oral contract and whether D & S Marine Transportation was reasonable in relying on representations made by Klotz on S & K Marine's behalf.

A two-day bench trial on D & S Marine Transportation's remaining claims commenced on September 12, 2016.  D & S Marine Transportation presented testimony from Patrick McDaniel, Calvin Klotz, Dean Cheramie, Ferdinand "Skip" Plaissance,[2] Wilton Joseph Gregory,[3] Craig Foret[4] and Charles Theriot.[5]  The parties entered a stipulation as to the testimony that Thomas Prosperie would have offered.[6]  At the close of D & S Marine Transportation's case, defendants moved under Rule 52(c) for judgment on partial findings arguing that they should prevail because:

(1)     S & K Marine did not have the capacity to enter into a contract before it was organized on December 11, 2013;

(2)     Klotz did not have the express or apparent authority to bind S & K Marine;

(3)     the bareboat charter agreement is void for lack of consent and form;

---

[2] Plaissance is Canal Barge Company's manager of vessel charters.  His testimony is not recounted herein because it is not material to the resolution of defendants' Rule 52(c) motion.

[3] Gregory is the owner of New Generations Shipyard.  His testimony is not recounted herein because it is not material to the resolution of defendants' Rule 52(c) motion.

[4] Foret is the general manager of logistics at Kirby Inland Marine.   His testimony is not recounted herein because it is not material to the resolution of defendants' Rule 52(c) motion.

[5]  Theriot is a Certified Public Accountant who offered expert testimony as to D & S Marine Transportation's damages.  His testimony is not recounted herein because it is not material to the resolution of defendants' Rule 52(c) motion.

[6] Prosperie is the D & S Marine entities' port captain.  The stipulation as to his testimony is not recounted herein because it is not material to the resolution of defendants' Rule 52(c) motion.

    (4)      S & K Marine cannot be held liable under the bareboat charter agreement because it never took delivery of the vessels;

    (5)      Strafuss cannot be held liable for tortious interference with a contract because there was no contract;

    (6)      S & K Marine cannot be held liable for detrimental reliance because D & S Marine Transportation's reliance on the alleged promise was unreasonable due to the failure to enter into the contemplated written bareboat charter agreement; and

    (7)      D & S Marine Service, not D & S Marine Transportation, is the proper party to claim damages because D & S Marine Transportation did not have charter agreements with either Canal Barge Company or Kirby Inland Marine.[7]

The court deferred ruling on defendants' Rule 52(c) motion.  Defendants thereafter presented testimony from Benedict Strafuss and Phillip Monteleone.[8]

## II.     Trial Testimony

McDaniel was a member of D & S Marine Transportation, along with Dean Cheramie and Scott Lerille.  D & S Marine Transportation was formed to grow the business started by Cheramie and Lerille with the related entity, D & S Marine Service.  D & S Marine Service's business consisted of time chartering vessels to Kirby Inland Marine.  D & S Marine Transportation's business consisted of time chartering vessels to other customers, such as Canal Barge Company.  Any new business that McDaniel brought in would go to D & S Marine Transportation, of which he was a member, so that he could share in the profits.

---

[7]  Defendants' Rule 52(c) motion can be resolved by addressing numbers 1, 5, and 6.  Therefore, it is unnecessary to analyze numbers 2, 3, 4 and 7.

[8]  Monteleone is a Certified Public Accountant who offered expert testimony as to D & S Marine Transportation's damages.  His testimony is not recounted herein because it is not material to the resolution of defendants' Rule 52(c) motion.

McDaniel testified that in January 2013, Klotz approached McDaniel regarding the NGS 106 to determine if D & S Marine Transportation had any interest in bareboat chartering the vessel, which Klotz and Strafuss were purchasing as an investment.  Klotz and Strafuss testified that Klotz took the lead on finding an operator for the vessel because he had more experience in the maritime industry than Strafuss and relationships with marine operators.  However, both Klotz and Strafuss had to agree before entering into a bareboat charter agreement.  In fact, Strafuss had the ultimate authority on whether to enter into a bareboat charter agreement because he was funding the project.  Klotz' authority was limited to negotiating the contract, and Strafuss had to approve it.

McDaniel thought that the bareboat charter would be a good opportunity for D & S Marine Transportation to grow its fleet.  McDaniel informed Cheramie that Klotz and Strafuss were interested in buying the NGS 106 and NGS 107 from New Generations Shipyard and chartering them to the D & S Marine entities.  Cheramie authorized McDaniel to go forward in negotiating with Klotz.  Cheramie knew that he could put the boats to work because both Kirby Inland Marine and Canal Barge Company had informed him that they needed additional vessels.  The NGS 106 would be bareboat chartered by D & S Marine Transportation because it would be time chartered to Canal Barge Company, and the NGS 107 would be bareboat chartered by D & S Marine Service because it would be time chartered to Kirby Inland Marine.

Cheramie and McDaniel testified that there was a meeting in July 2013 attended by the two of them, Klotz and Strafuss where they discussed the "nuts and bolts" of the bareboat charter agreement.  Cheramie and McDaniel both testified that there was an agreement for a five-year term with an $850 day rate, and an optional five-year term.  McDaniel testified that he and Klotz reached an agreement as to the "scope of the [charter] agreement[,]" including "the time frame, the money,

the payment, [and] the term," and that they would add the "smaller pieces" later.  According to McDaniel, the contract was formed before October 16, 2013.

Klotz testified that at the July 2013 meeting, they discussed the day rate for the first five-year term and settled on $850 per day.  However, the number could have changed throughout the negotiations.  Klotz testified that "[f]or the first five years, [they] worked on a day rate of $850, and [they] were still discussing the second five even further along."  Eventually, he and McDaniel agreed to $950 as the day rate for the optional five-year term, subject to the approval of Strafuss.

Strafuss testified that in addition to the day rate, there was a discussion about D & S Marine Transportation's purchasing the vessel at a discounted rate at the end of the bareboat charter agreement.  Strafuss objected to such a term, and Klotz knew about Strafuss' objection.  At the end of the meeting, Strafuss told Cheramie and McDaniel to talk to Klotz about "some of the high level terms" and to send Strafuss a proposal in writing so that he could have it reviewed by a Certified Public Accountant and an attorney.  Strafuss specifically stated that he never told anybody at D & S Marine Transportation that Klotz had the ability to bind him or the yet-to-be-named limited liability company that he and Klotz were contemplating forming.

On August 1, 2013, Klotz and Strafuss entered into an agreement regarding their venture. See Exhibit #2.  It stated that they would form a yet-to-be-named limited liability company that would be owned 50-50 by each of them, and would own a push boat being built by New Generations Shipyard. Id.  Klotz would oversee the construction and "find and negotiate a favorable dry lease for the push boat with a reputable push boat operator." Id. Strafuss would wire 50% of the total construction cost to New Generations Shipyard, and Klotz would repay the interest free loan to Strafuss after the sale of Cummins Mid-South, a company of which they were both part owners. Id.

8

Strafuss and Klotz would both research and jointly determine an optimum loan for the push boat. Id.  Finally, if either of them was prohibited from owning a vessel, Klotz would sell it and they would evenly split the proceeds or losses. Id.  Klotz and Strafuss both testified that the agreement was verbally modified so that Klotz owned 49 percent and Strafuss owned 51 percent, because Strafuss had "put all the money up."  With respect to finding an operator, Strafuss testified that he specifically told Klotz that he could "only negotiate[,]" and that he could not bind Strafuss to any agreement.

Klotz testified that after he and Strafuss entered into the August 1, 2013, agreement, they signed a purchase agreement with New Generations Shipyard for the NGS 106.  Klotz testified that he and Strafuss were signing in their individual capacities.  He stated that he could not sign for S & K Marine because he was not a member of the company, which did not yet exist.

McDaniel testified that once agreements were reached at the July 2013 meeting as to the charter hire rate and the five-year term the parties moved forward with finalizing the bareboat charter agreement, watching the vessel construction progress and preparing to put the vessel to work.  D & S Marine Transportation started making the NGS 106 a "D & S-style boat" by requesting modifications to the paint scheme, gears and wheels.  Cheramie testified that Klotz knew from the beginning that the vessels needed to be modified to fit the D & S Marine entities' standards with the same type of gears, propellers and shafts as the other vessels in the D & S Marine entities' fleet, so that the parts would all be interchangeable.  McDaniel and Cheramie both testified that they requested that Klotz make the changes, Klotz had to get Strafuss' approval, but that Strafuss eventually approved the changes.  McDaniel and Thomas Prosperie, the D & S Marine entities' port

engineer, went to New Generations Shipyard and observed the modifications being made to the NGS 106.

With respect to vessel modifications, Klotz testified that Strafuss had to approve the changes to the marine gears and propellers because he was paying all the money. The railings were modified by the shipyard at no extra cost. Strafuss testified that at some point Klotz asked him about modifying the gears to fit the D & S Marine entities' preferences. Klotz told him that the requested gears were common in the marine industry, more robust, and would make the vessel more valuable. Strafuss agreed to pay the extra cost for the gears. Klotz testified that at some point, Joe Gregory, the owner of New Generations Shipyard, asked him what colors to paint the NGS 106, and he passed the memo on the McDaniel. It would be painted in colors unique to the D & S Marine entities. Klotz was aware that D & S Marine personnel were visiting the shipyard. He does not recall whether he told Strafuss, but he thinks Strafuss knew that this was occurring.

McDaniel testified that he approached D & S Marine Transportation's customers to "put the vessel to work." McDaniel spoke with Skip Plaissance, the chartering manager at Canal Barge Company. Canal Barge Company committed to time charter the NGS 106. McDaniel testified that he told Klotz about this agreement. However, Klotz testified that although he knew by August 2013 that D & S Marine Transportation was going to time charter the vessels to other companies because that was its business model, he was not aware that McDaniel was seeking out a specific time charter agreement for the NGS 106. McDaniel also testified, prior to October 16, 2013, he had a verbal commitment from Kirby Inland Marine to time charter the NGS 107. In McDaniel's experience, verbal commitments are binding in the maritime industry.

On October 16, 2013, Strafuss and Klotz went to New Generations Shipyard and signed a purchase agreement for the NGS 107.  From there, they went to the D & S Marine entities' offices and met with McDaniel to tour a vessel.  Strafuss testified that he told McDaniel that he was "still waiting for some terms, a proposal, something [he could] take a look at and give to [his] experts."  McDaniel replied that he was "working on it."  Strafuss testified that, at that meeting, there was no agreement or development on any terms of the proposed bareboat charter agreement.

McDaniel testified that on November 4, 2013, he outlined the essential terms of the charter agreement in an email to D & S Marine Transportation's external attorney, Leon Rittenberg, and asked Rittenberg to draft a bareboat charter agreement.  See Exhibit # 13.  These terms included a five-year term and five-year renewal option, a purchase option, an $850.00 daily charter rate, and that D & S Marine Transportation would supply all fuel, lube and related taxes, would crew and maintain the vessel, and carry vessel insurance.  McDaniel testified that Klotz and Strafuss requested that D & S Marine Transportation undertake to draft an agreement that could be marked up as needed.  On November 19, 2013, McDaniel sent the draft contract to Strafuss "as a starting point," noting that they could "mark up and discuss as needed." See Exhibit #18.

Strafuss testified that he received the first draft of the proposed charter agreement in mid-November 2013 via an email from McDaniel.  See Exhibit #18.  Strafuss testified that, when he received the document, he consulted Quin Breland a maritime attorney at Baker Donelson's New Orleans office.  Strafuss sent Breland the draft bareboat charter agreement.  Strafuss responded to McDaniel that he was reviewing the contract with his attorneys and was going to set up a limited liability company.  Strafuss looked over the contract and saw that a purchase option was included, to which he objected.

11

On December 9, 2013, Strafuss received an email from his attorneys at Baker Donelson that attached a redlined version of the draft bareboat charter agreement. See Exhibit #23. The attorneys made 150 total changes. Id.  They noted that there were "quite a few changes as the agreement was very pro-operator." Id.  The attorneys also stated that the terms regarding repairs, termination, arbitration and insurance needed to be discussed. Id.  The attorneys added the line in paragraph 1 that stated that the agreement would be void if the owner did not take delivery of the vessel. Id.  They also added paragraph 4 regarding the assignment of warranty rights and the line in paragraph 6 regarding the continued payment of charter hire when the vessel is being repaired.  Id. The attorneys made changes to paragraph 10 regarding taxes, and paragraph 11 with respect to maritime liens.  There were many other substantive changes.

On December 11, 2013, the Louisiana Secretary of State issued the articles of organization for S & K Marine.  See Exhibit #76.  Klotz testified that S & K Marine was the limited liability company that he and Strafuss had contemplated in the August 1, 2013, memorandum.  However, Klotz testified that he never became a member because he did not put any money into the company.

Also on December 11, 2013, Klotz forwarded the redline version of the contract to McDaniel via email stating that the document included "changes to discuss on contract." See Exhibit #21. McDaniel testified that he spoke with Klotz on the telephone about the changes. McDaniel then forwarded it to Rittenberg stating that he spoke with Klotz and they both had changes and questions to discuss with Rittenberg. Id.  Strafuss testified that it was important to him that the parties agreed to all of the material terms, and that the contract be in writing and signed by him and D & S Marine Transportation.

Strafuss testified that, at this point, he was "still trying to get [his] arms around" some financial terms in the proposed bareboat charter agreement, like the purchase option and day rate. He stated that he did not have financing and needed to talk to a banker to secure a loan, which was especially important for Klotz, who did not have the necessary cash on hand.  On December 19, 2013, Strafuss and Klotz received an email from Derek Chaisson at Whitney Bank informing them that their proposed financing was not feasible with an $850 day rate.

In December 2013, Strafuss learned that Klotz was not going to leave his employment with Cummins Mid-South, and Klotz would have to get permission from Cummins Mid-South to own vessels.  Strafuss felt "vulnerable" because he was unfamiliar with the maritime industry and had spent $4,000,000 of his personal savings to purchase the vessels.  After speaking with his wife, Strafuss decided to call Walter Blessey, who owns a large fleet of vessels, to ask for advice. Blessey asked if Strafuss had signed an agreement with D & S Marine Transportation.  Strafuss said that he had not.  Blessey suggested that they form a joint venture.  Strafuss would put in the two vessels, and Blessey would put in four barges.  Strafuss told Klotz about Blessey's offer and said that he wanted to take it because they had not heard anything from D & S Marine Transportation regarding the draft bareboat charter agreement.

Also in December 2013, before the NGS 106 was complete and a bareboat charter agreement signed, Klotz asked McDaniel to create records showing that the vessel was in service before the end of the calendar year so that Klotz and Strafuss could claim accelerated depreciation that was available for the 2013 tax year.  McDaniel spoke to Cheramie about this and they declined to do so, finding it was not in their best interest to create "logs on a boat and show it working without it working."

13

On January 14, 2014, Rittenberg sent an email to McDaniel, copying Cheramie, attaching a revised draft of the charter agreement, and noting that it was "not quite in a form where you can send it back to the other side[,]" because there were comments that they needed to discuss. See Exhibit #40. McDaniel testified that "other side" meant Strafuss and Klotz. This was the third draft of the contract. Id. Paragraph 3 included an addition of language that stated that S & K Marine would pay to repair any defects in construction not in conformity with the plans and specifications and any defects in equipment discovered within one year of delivery of the vessel, if those items are not covered by a manufacturer's warranty. Id. McDaniel testified that Rittenberg added this, but he knows it was not agreed to by the parties.

In January 2014, Strafuss informed Klotz that he wanted to talk to Blessey about the vessels. On January 28, 2014, Strafuss stated in an email to Klotz that it was his "simple view that [they] still [did] not have a deal with D&S and so [he] want[ed] to see what was available at this point in time." See Exhibit #36. Strafuss further stated that D & S Marine Transportation "could have accepted the contract as offered weeks ago but they opted to continue negotiating." Id. Thus, Strafuss wanted "to secure the best deal for [his/their] money[,]" and he preferred "to have both push boats with the same company for simplicity sake." Id. Strafuss further noted that they could not get a loan from Whitney Bank because there was no contract with D & S Marine Transportation, which meant that Strafuss would have to use money from his savings account to pay New Generations Shipyard. Id.

On January 31, 2014, McDaniel emailed Klotz stating that they should finalize the contract the next week, and that McDaniel would send Klotz a copy to review. See Exhibit #37. Klotz replied that they needed to meet the following week to finalize the contract. Id.

On February 5, 2014, Rittenberg sent McDaniel an email attaching the ninth draft of the bareboat charter agreement, including changes covered in their telephone calls that day and the previous day.  See Exhibit #43.  In this version, the day rate for the optional five-year term changed to $900 per day. Id.  McDaniel testified that this change was made because Klotz requested it in a telephone conversation.

On February 7, 2014, Strafuss emailed Blessey to accept his proposal to form a joint venture. See Exhibit #49.

Also on February 7, 2014, Rittenberg sent the eleventh draft to McDaniel via email.  See Exhibit #50.  Thereafter, on February 10, 2014, McDaniel replied to Rittenberg requesting that he correct the spelling of the vessel's name and remove some wording from the first sentence. See Exhibit #51.

On February 10, 2014, McDaniel sent Klotz an email attaching a draft of the charter agreement stating that it should have all the needed changes. See Exhibit #52.   Klotz testified that he did not think Strafuss would agree to the language in paragraph 3 regarding S & K Marine's paying for certain repairs not covered by a manufacturer's warranty.   By the time he received this email, Klotz knew that Strafuss was considering chartering the vessels to Blessey.  Klotz testified that when the draft charter agreements were going back-and-forth, he told McDaniel that Strafuss would not approve certain items.  Specifically, Klotz recalled Strafuss not approving the purchase option.  Klotz thought that D & S Marine Transportation knew that Strafuss had to sign off on the final contract

On February 13, 2014, Josh Jones of Whitney Bank wrote to Klotz and Strafuss regarding the proposed loan. See Exhibit #53.  The letter stated that Whitney Bank had to review the executed

bareboat charter agreements before the loan closing. Id.  At this point, there were no executed bareboat charter agreements.

On February 14, 2014, McDaniel sent "the latest" version of the charter agreement to Klotz. See Exhibit #52.  This was the thirteenth version. Id.  Paragraph 3 included the language requiring S & K Marine to pay for any repairs not covered by a manufacturer's warranty. Id.  McDaniel testified that although the written contract was not executed, there was an agreement as to the scope of the contract which never changed, and the rest, including paragraph 3, was "contractual verbiage."

McDaniel compared the first draft of the charter agreement sent to Strafuss on November 19, 2013, (Exhibit #18 and 21), with the last draft sent to Klotz on February 14, 2014 (Exhibit #52). Between the two drafts there were the following changes to the "high level" terms that formed the "scope of this agreement":

- The day rate for the optional five-year term changed from $850 in the first draft to $900 in the last draft.

- The purchase option in the first draft provided that D & S Marine Transportation had "the option to purchase the vessel at the end of the term at a value equal to 75 percent of the fair market value of the vessel."  In the last version, the purchase option is deleted.

- The right of first refusal in the first draft stated that D & S Marine Transportation could purchase the vessel at a discount of 20% less than any third-party purchaser's offer.  In the last version, this changes to 20% off of the fair market value.

- The first version does not include the language included in paragraph 3 of the last version requiring S & K Marine to warrant that the vessel is fit for its intended purpose and repair any defects not covered by a manufacturer's warranty.

- The first draft states that the vessel was to be delivered to D & S Marine Transportation with full fuel tanks, which is approximately 32,000 gallons.  The last version states that the vessel would be delivered to D & S Marine Transportation with 4,000 gallons of fuel.

See Exhibit #18, 21 and 52.  There were also changes to the taxes and insurance provisions. Id. McDaniel acknowledged that no version of the charter agreement required D & S Marine

Transportation to time charter the vessel, and that D & S Marine Transportation's only obligation to S & K Marine under the contract was to pay the day rate.

McDaniel testified that in February 2014, he learned that the NGS 106 would not be chartered to D & S Marine Transportation when Prosperie reported that Blessey's employees were on the vessel at the shipyard and reported this information to Cheramie. Cheramie testified that he was shocked because he thought that D & S Marine Transportation was going to bareboat charter the NGS 106, and had bought some rigging, a satellite compass, a jon-boat and an outboard motor for it.[9] McDaniel telephoned Klotz, who told him that Strafuss had decided not to charter the vessel to D & S Marine Transportation. McDaniel informed Klotz that this was a problem because D & S Marine Transportation already had a time charter agreement with Canal Barge Company. Klotz stated that he tried to get Strafuss to "honor the deal," but to no avail. D & S Marine Transportation had to build another vessel to time charter to Canal Barge Company.

On February 17, 2014, Klotz emailed Strafuss another draft of the proposed bareboat charter agreement with D & S Marine Transportation. See Exhibit #57. Strafuss testified that he was shocked at receiving this because he had told Klotz that he had decided to contract with Blessey and to stop negotiating with D & S Marine Transportation. Strafuss testified that he never would have agreed to the section of paragraph 3 of the proposed bareboat charter agreement that required S & K Marine to warrant that the vessel was built in a good and workmanlike manner and assume the cost of repairing any defects not covered by a manufacturer's warranty.

_____

[9] Cheramine testified that there was no receipt or invoice showing that a D & S Marine entity purchased a compass, but he knew they bought one. Further, the invoice for the jon-boat stated that it was purchased on February 13, 2014. See Exhibit #54.

Also on February 17, 2014, Klotz sent an email to Strafuss in which Klotz compared the alleged bareboat charter agreement with D & S Marine Transportation and the proposed venture with Blessey.  See Exhibit #58.  Klotz concluded that "both deals are good." Id.  However, Klotz stated that he would prefer to charter the first vessel to D & S Marine Transportation, and offer the second vessel to Blessey.  Id.  Klotz informed Strafuss that he spoke with McDaniel over the telephone and that McDaniel "was very upset if [S & K Marine] did not go through with the bareboat charter with D&S and thought [they] had a verbal and hand shake agreement." Id.  Klotz also said that D &S Marine Transportation has "been working with [S & K Marine] since day one helping with the yard and [S & K Marine] even ordered the wheels and gears to meet [D & S Marine's] needs among other things." Id.  Further, Klotz said "we did move forward with D&S in August 2013 having numerous meetings and many contact[s] and in fact would not have signed second vessel on October 16, 2013[,] if we did not have their verbal commitment to do a deal . . . I think we should try to honor the D&S deal on boat #1 . . . we always thought D&S was a fair deal and moved forward with them for many months." Id.

Klotz testified that he used the word "deal" in the email to mean a deal in the making.  He testified that there was no full and final agreement between D & S Marine Transportation and S & K Marine.  Strafuss similarity testified that Klotz "uses the word *deal* interchangeably with *negotiations*."

# ANALYSIS

## I.     Rule 52(c) of the Federal Rules of Civil Procedure

Rule 52(c) of the Federal Rules of Civil Procedure provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).  When considering a motion under Rule 52(c), the court weighs and resolves conflicts in the evidence, and "decides in which party's favor the preponderance of the evidence lies." 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2573.1 (3d ed. 2016). No inferences are drawn in the nonmovant's favor. Id.

## II.    D & S Marine Transportation's Breach of Contract and Bad Faith Breach of Contract Claims against S & K Marine

### A.  Contract Formation under Louisiana Law[10]

Under Louisiana law, "[a] contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906.   The formation of a valid contract requires: (1) capacity to contract; (2) mutual consent; (3) a certain object; and, (4) a lawful purpose. Id. at arts. 1918, 1927, 1966, and 1971.  There is no dispute in this matter regarding object and lawful purpose.  S & K Marine argues that it did not have the capacity to contract, and

---

[10]   In prior a ruling, this court found that Louisiana law, rather than the general maritime law, applies to this matter because it involves vessels under construction. See Rec. Doc. 35.  D & S Marine Transportation argued that the general maritime law applied and that the parties reached a binding "fixture" to form a bareboat charter agreement when all of the essential terms were determined, particularly, the day rate and the length of the term.

thus the alleged bareboat charter agreement is relatively null.  D & S Marine Transportation contends that S & K Marine confirmed or ratified the contract after S & K Marine was formed.

### B.  S & K Marine's Capacity to Contract

All natural and juridical "persons have the capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting." La. Civ. Code arts. 24 and 1918.  A limited liability company is a juridical person as it is "'an entity to which the attributes personality.'"  Montgomery v. Lester, - - - So.3d - - -, 2016 WL 5416893, at *2 (La. Ct. App. Sept. 28, 2016) (quoting La. Civ. Code art. 24).  "The personality of a juridical person is distinct from that of its members." La. Civ. Code art. 24.

Under Louisiana law, a limited liability company is formed when the articles of organization and initial report are filed with the Louisiana Secretary of State. See La. Rev. Stat. § 12:1304(A).  If the Secretary finds that the articles of organization and initial report comply with the law and all fees have been paid, the Secretary records the articles of organization and initial report in his office, endorses them with the date of filing, and issues a certificate of organization. Id. at § 12:1304(B).  The limited liability company is duly organized upon the issuance of the certificate of organization and its separate existence begins as of the time of filing of the articles of organization with the Secretary of State. Id. at § 12:1304(c).  A limited liability company has the same powers, rights, and privileges provided for a corporation and for a partnership organized under Louisiana law. Id. at § 12:1303(A).  A limited liability company, like a corporation, "has the power to do all things necessary or convenient to carry out its business and affairs, including" to "make contracts." Id. at § 12:1-302(7).

Exhibit #76 is S & K Marine's Certificate of Organization issued by the Louisiana Secretary of State.  The document states that S & K Marine was formed on December 11, 2013.  The attached Articles of Organization state that Strafuss is the manager of S & K Marine.  Klotz identified this document during his testimony.  Klotz also testified that, prior to this date, he could not have been acting for S & K Marine because it did not exist.  Therefore, he and Strafuss were acting for themselves in their personal capacities when they signed the purchase agreements with New Generations Shipyard.  Strafuss and Klotz both testified that Klotz never became a member of S & K Marine.  D & S Marine Transportation claims that the bareboat charter agreement was formed no later than October16, 2013.  Exhibit #76, along with Klotz's and Strafuss' testimony, establish that S & K Marine did not exist until December 11, 2013.  Thus, S & K Marine did not have the capacity to enter into any contract on October 16, 2013.

### C.  S & K Marine's Alleged Confirmation or Ratification of the Alleged Contract

Although D & S Marine Transportation acknowledges that S & K Marine did not exist until December 11, 2013, D & S Marine Transportation claims that, after S & K Marine's formation, S & K Marine confirmed or ratified the bareboat charter agreement that D & S Marine Transportation claims was formed by October 16, 2013.  D & S Marine Transportation argues that S & K Marine's confirmation or ratification of the contract is proved by the testimony of McDaniel and Klotz and the documents that demonstrate that the $850 day rate for the first five-year term was never changed in any of the drafts of the bareboat charter agreement.  D & S Marine Transportation claims that the day rate was the basic agreement required to form the bareboat charter agreement.  D & S Marine Transportation also claims that the contract was confirmed and ratified when Strafuss sent an email to his attorney and Klotz on December 10, 2013, stating that they needed to get D & S Marine

21

Transportation to take delivery of the NGS 106 before January 1, 2014, for tax reasons.  Further, D & S Marine Transportation argues that the contract was confirmed and ratified because Strafuss knew that they were preparing to operate the vessels by securing time charter agreements with their customers.

S & K Marine argues that there is no evidence of confirmation or ratification of the alleged bareboat charter agreement.  S & K Marine points to the time line of events.  On November 19, 2013, McDaniel sent a draft bareboat charter agreement to Strafuss for the first time.  See Exhibit #18.  Strafuss informed McDaniel that he was going to have his attorneys and accountant review the document.  On December 9, 2013, Strafuss' attorneys returned the document to him with 150 changes, some of which were substantial.  Strafuss sent the document to Klotz, who sent it back to McDaniel on December 10, 2013.  Strafuss formed S & K Marine the next day, on December 11, 2013.  On February 17, 2014, Strafuss receives a purported final version of the bareboat charter agreement from Klotz, who received it from McDaniel.  Strafuss testified that between December 11, 2013, and February 17, 2014, he did not receive any communication from D & S Marine Transportation regarding the draft bareboat charter agreement.  Further, from the first draft to the last draft, there were changes to the day rate, purchase option, right of first refusal, warranty, fuel and insurance terms.

A contract is relatively null when it is made by a person who lacks legal capacity to contract. La. Civ. Code arts. 1919 and 2031.  The party that lacked capacity may invoke the relative nullity. Id. at art. 2031.  However, a relatively null contract may be confirmed. Id. at arts. 2031 and 1841. Confirmation, which is "a declaration whereby a person cures the relative nullity of an obligation[,]" may be express or tacit. Id. at art. 1841.  "An express act of confirmation must contain or identify

the substance of the obligations and evidence the intention to cure its relative nullity." Id.  "Tacit confirmation may result from voluntary performance of the obligation." Id.  Actions that are sufficient to ratify a contract will act as confirmation of the contract. Rowan v. Town of Arnaudville, 832 So.2d 1185, 1190 (La. Ct. App. 2002).  "Ratification is a declaration whereby a person gives his consent to an obligation incurred on his behalf by another without authority." La. Civ. Code art. 1843.  "An express ratification must evidence the intention to be bound by the ratified obligation[,]" whereas a tacit ratification occurs when a person accepts the benefit of an obligation that he knows was incurred on his behalf by another. Id.  "The effects of confirmation or ratification are retroactive to the date of the confirmed or ratified obligation." Id. at art. 1844.

The evidence shows that Strafuss was the sole person with authority confirm or ratify the alleged bareboat charter agreement on S & K Marine's behalf.  Strafuss was the only member of S & K Marine.  Both Strafuss and Klotz testified that Klotz did not have authority to bind Strafuss or S & K Marine to a bareboat charter agreement.  Klotz testified that he told McDaniel and Cheramie that he did not have such authority.

There is no evidence that Strafuss confirmed or ratified the alleged bareboat charter agreement after the formation of S & K Marine.  Strafuss testified that he did not communicate with anyone regarding the terms of the draft bareboat charter agreement between December 11, 2013, and February 17, 2014.  He also testified that he did not agree to the terms proposed by D & S Marine Transportation in the November 19, 2013, draft.  The draft agreement was returned to D & S Marine Transportation on December 10, 2013, with multiple material changes made by Strafuss' attorneys. Strafuss did not receive a returned draft from D & S Marine Transportation until February 17, 2014. Strafuss testified that it was important to him that the parties agree on all of the terms, that the

23

contract be in writing and that both he and D & S Marine Transportation signed the written contract. This never occurred.  Therefore, there is no evidence that Strafuss expressly confirmed or ratified the alleged bareboat charter agreement.

Moreover, there is no evidence that Strafuss tacitly confirmed or ratified the alleged bareboat charter agreement on S & K Marine's behalf after it was formed.  Tacit confirmation requires voluntarily beginning performance.  S & K Marine's required performance under the alleged bareboat contract was to deliver the vessel to D & S Marine Transportation.  This undisputedly did not occur.

Similarly, tacit ratification occurs when a person accepts the benefit of an obligation that he knows was incurred on his behalf by another.  D & S Marine Transportation claims that Strafuss accepted the benefit of its entering into time charter agreements with Canal Barge Company and Kirby Inland Marine.  However, those time charter agreements are not the benefit of the alleged obligation.  The obligation at issue is Klotz's alleged agreement to bareboat charter the vessels to D & S Marine Transportation.  The benefit of that obligation to S & K Marine would be receiving the day rate.  None of the draft bareboat charter agreements required D & S Marine Transportation to enter into time charter agreements for the vessels.  Klotz, McDaniel and Cheramie all testified that D & S Marine Transportation's only obligation to S & K Marine under bareboat charter agreement was to pay the day rate.  Thus, receiving the day rate would be the manner in which Strafuss could tacitly ratify the contract.  This undisputedly did not happen.

Thus, the alleged contract was relatively null due to S & K Marine's lack of capacity, and Strafuss did not confirm or ratify the alleged contract after S & K Marine was formed.  Therefore, S& K Marine's Rule 52(c) motion is GRANTED as to D & S Marine Transportation's breach of

contract and bad faith breach of contract claims against it, and those claims are DISMISSED WITH PREJUDICE.

## III.    D & S Marine Transportation's Detrimental Reliance Claim against S & K Marine

S & K Marine argues that its Rule 52(c) motion should be granted as to D & S Marine Transportation's detrimental reliance claim because a writing was required for the bareboat charter agreement to be formed.

The doctrine of detrimental reliance is provided in Louisiana Civil Code article 1967, which states:

> Cause is the reason why a party obligates himself. A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

There are three elements required for the application of the doctrine of detrimental reliance: (1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance. Morris v. Friedman, 663 So.2d 19, 25 (La. 1995). "[T]he basis of detrimental reliance is 'the idea that a person should not harm another person by making promises that he will not keep.'" Suire v. Lafayette City-Parish Consol. Gov't, 907 So.2d 37, 59 (La. 2005). "Thus, the focus of analysis of a detrimental reliance claim is . . . whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment." Id.  It is not necessary for a plaintiff to establish the existence of an enforceable contract to recover for detrimental reliance. Rogers v. Brooks, 122 Fed. Appx. 729, 732 (5th Cir. 2004) (citing Newport Ltd. v Sears, Roebuck & Co., 6 F.3d 1058,

1069 (5th Cir. 1993)).  However, reliance on an alleged promise is unreasonable when the parties anticipate entering into a written agreement and negotiate the terms of a written agreement that were not mutually agreeable. Id.

D & S Marine Transportation argues that it was justified in relying on "defendants' representations, by word and by conduct, that D&S would be the bareboat charterer of the NGS-106 and the NGS-107."  As evidence, it points to modifications to the NGS 106 that were approved by the "owners."  D & S Marine Transportation also cites Klotz's asking for McDaniel's input in selecting paint colors for the NGS 106.  Further, D & S Marine Transportation points to its meeting with Whitney Bank regarding Klotz's and Strafuss' financing the vessels, and its procuring time charter agreements with Canal Barge Company and Kirby Inland Marine.

S & K Marine is the sole defendant for D & S Marine Transportation's detrimental reliance claim.  Strafuss and Klotz both testified that Strafuss was the only member of S & K Marine and the only person authorized to act on behalf of the company.  Strafuss and Klotz both testified that Klotz was not authorized to bind S & K Marine or Strafuss.  Further, they both testified that D & S Marine Transportation knew that Klotz did not have such authority.  Thus, D & S Marine's reliance on any of Klotz's actions was unreasonable.

Moreover, Strafuss' testimony establishes that he never took any actions on which D & S Marine Transportation could have relied.  He testified that he decided to make the changes to the vessel requested by D & S Marine Transportation because they were not unique to D & S Marine Transportation, and increased the vessel's value.  These changes occurred before S & K Marine was formed.  Strafuss testified that, after S & K Marine was formed, he did not communicate with D & S Marine Transportation regarding the alleged bareboat charter agreement.  There is no evidence

of any actions taken by Strafuss after the formation of S & K Marine on which D & S Marine Transportation could have relied.

Further, Strafuss testified that he required the bareboat charter agreement to be in writing for him to be bound, which never occurred.  All versions of the draft bareboat charter agreement included signature blocks for the parties and an integration clause which stated that the written agreement "constitutes the entire agreement between the parties concerning this Agreement and supersedes all prior agreements, written or verbal understanding or agreements, and, this Agreement is the sole agreement between the parties as to the charter of the Vessel." D & S Marine Transportation was aware that a writing was required and that the integration clause was included. Therefore, any reliance on oral representations or other actions was unreasonable.  S & K's Rule 52(c) motion is GRANTED as to D & S Marine Transportation's detrimental reliance claim, and that claim is DISMISSED WITH PREJUDICE.

## IV.   D & S Marine Transportation's Tortious Interference with Contractual Relations Claim against Strafuss

Strafuss argues that D & S Marine cannot sustain a claim against him for intentional interference with a contract because there was no contract.

In 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 234 (La. 1989), the Supreme Court of Louisiana recognized a limited cause of action for tortious interference with contractual relations that pertains "only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." The elements of the cause of action are:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or

27

> causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

Id. at 234.

Because the court has found that no contract was formed, D & S Marine Transportation does not have a claim against Strafuss for tortious interference with a contract. Therefore, Strafuss' Rule 52(c) motion for judgment on partial findings is GRANTED as to this claim, and it is DISMISSED WITH PREJUDICE.

## CONCLUSION

The court concludes that S & K Marine did not have the capacity to contract on October 16, 2013, the date by which D & S Marine Transportation claims that a bareboat charter agreement was confected, and that S & K Marine did not confirm or ratify the alleged oral contract after it was formed. Also, D & S Marine Transportation's reliance on any actions made by Klotz or Strafuss was unreasonable because all drafts of the bareboat charter agreement indicated that a writing was required and that it was the only agreement between the parties. Further, because there was no contract, Strafuss cannot be held liable for tortious interference with a contract. Therefore,

**IT IS HEREBY ORDERED** that Defendants' Motion for Judgment on Partial Findings under Rule 52(c) of the Federal Rules of Civil Procedure is **GRANTED**, and D & S Marine Transportation's remaining claims are **DISMISSED WITH PREJUDICE**.

28

New Orleans, Louisiana, this <u>23rd</u> day of November, 2016.


**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**